**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**Filed 5/23/96**

**TENTH CIRCUIT**

CHURCH ON THE ROCK; DON KIMBRO, Pastor,

                Plaintiffs - Appellants,

       v.

CITY OF ALBUQUERQUE; TONI MARTORELLI, in her official capacity as Director of Family and Community Services for the City of Albuquerque; MARK SANCHEZ, in his official capacity as Deputy Director of Family and Community Services for the City of Albuquerque; KATHLEEN STARK, in her official capacity as Supervisor, Bear Canyon Senior Center, City of Albuquerque,

              Defendants - Appellees.

No. 95-2009

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D. C. No. 94-CV-1101)**

Benjamin W. Bull, The American Center for Law and Justice, Phoenix, Arizona (Jay Alan Sekulow, The American Center for Law and Justice, Washington, DC, Nikolas T. Nikas, The American Center for Law and Justice, Phoenix, Arizona, and Paul F. Becht, Becht Law Firm, Albuquerque, NM, with him on the briefs) for the Appellants.

William D. Winter, Assistant City Attorney (Robert M. White, City Attorney, with him on the brief) Albuquerque, NM, for the Appellees.

Before TACHA, LOGAN, and REAVLEY,[*] Circuit Judges.

TACHA, Circuit Judge.

Plaintiffs Church on the Rock and Pastor Don Kimbro ("Church on the Rock") brought suit under 42 U.S.C. § 1983 alleging that defendants the City of Albuquerque and its agents ("the City") denied Church on the Rock's First Amendment right to free expression at City Senior Centers. The district court granted summary judgment in favor of the City on all claims. Church on the Rock now appeals, arguing that the City's policy prohibiting "sectarian instruction and religious worship" at City Senior Centers violates the First Amendment. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and reverse.

## I. Background

The City owns and operates six Senior Centers. The centers are multipurpose facilities that provide forums for lectures, classes, movies, crafts, bingo, dancing, physical exercise, and other activities. To become a member of a Senior Center, one need only fill out an application. The sole requirement for membership is that a person be at least fifty-five years old or be married to a member who is at least fifty-five years old. People who use the Senior Centers do not reside there, and all of the programs are voluntary.

Many of the programs at the Senior Centers are organized and sponsored by private individuals or organizations. Senior center policies permit non-member groups to use the centers

[*]The Honorable Thomas M. Reavley, Senior Circuit Judge, United States Court of Appeals for the Fifth Circuit, sitting by designation.

for classes and other activities if the subject matter is "of interest to senior citizens." Alternatively, groups may use the Senior Centers without regard to this subject matter requirement if they are composed of seventy-five percent or more senior citizens. Nonmembers or persons under fifty-five years of age may conduct classes, and people who deliver lectures or teach classes are also permitted to distribute literature.

The range of subjects that qualify as being "of interest to senior citizens" is quite broad. The Senior Centers' activities catalogs list many of the programs that meet this requirement, such as Amateur Radio, Ceramics, Chinese, Choral Group, Economics, El Abuelo--The Clown of Spanish Culture, Fishing, Medicare/Health Insurance Counseling, Myth of the Hanging Tree, and Plants and People of New Mexico. The catalogs also include a number of classes and presentations in which religion or religious matters are the primary focus: Bible as Literature, Myths and Stories About the Millennium, Theosophy, and A Passover Commemoration (an oratorio). The catalogs encourage "ideas for new classes and programs" as well.

On March 24, 1994, Pastor Kimbro, a citizen over the age of fifty-five, requested permission from Kathleen Stark, the supervisor of the Bear Canyon Senior Center, to show a two-hour film entitled Jesus. The film recounts the life of Jesus Christ as described in the Gospel of Luke. At the conclusion of the story, a voice-over narrator makes affirming statements such as, "Jesus is exactly who he claimed to be--the Son of the Lord, the Savior of all mankind." The narrator then invites viewers to adopt the Christian religion and to join him in a short prayer. Kimbro also requested permission to give away giant-print New Testaments to persons attending the film.

On May 18, 1994, after reviewing the film, Mark Sanchez, the City's Deputy Director of

Family and Community Services, denied Kimbro's requests. Sanchez stated that City policy prohibited the use of Senior Centers "for sectarian instruction or as a place for religious worship." The City adopted this policy to conform with the terms of the Older Americans Act. The Older Americans Act provides federal funding to the states for multipurpose senior centers, but requires, as a condition for receiving such funding, that the "facility will not be used and is not intended to be used for sectarian instruction or as a place for religious worship." 42 U.S.C.A. § 3027(a)(14)(A)(iv).

In keeping with this directive, Senior Center personnel screen programs for sectarian instruction or religious worship before allowing them at the Senior Centers. Senior Center employees also monitor presentations for religious content by sitting in on classes and entertaining objections from Senior Center members who call attention to expression falling into one of these forbidden categories. When Senior Center employees determine that presentations are too religious in nature, they intervene to stop the presentations. There are no official criteria or written standards to assist them in deciding whether or not expression constitutes "sectarian instruction" or "religious worship."

Church on the Rock filed this suit seeking declaratory and injunctive relief. The district court granted summary judgment in favor of the City. In its decision, the court assumed without deciding that the Senior Center is a designated limited public forum. The court stated that the purpose of the Senior Center does not include sectarian instruction, and that the primary purpose of the film Jesus is to proselytize. The court concluded that the film constitutes sectarian instruction and that the City may therefore exclude the film on the ground that its subject matter is not within the purpose of the Senior Centers. The court also held that the City's restriction is

not viewpoint-based because the City does not permit sectarian instruction from any religious perspective. This appeal followed.

### II. The Degree of First Amendment Protection Afforded to the Expression

We review the district court's grant of summary judgment de novo. Cannon v. City and County of Denver, 998 F.2d 867, 870 (10th Cir. 1993). We begin our analysis by noting that the speech in question is entitled to First Amendment protection. It is well established that religious worship and discussion are forms of speech and association protected by the First Amendment. Widmar v. Vincent, 454 U.S. 263, 269 (1981); Heffron v. International Soc. for Krishna Consciousness, 452 U.S. 640, 647 (1981). The City argues that the proselytizing religious speech in the film Jesus enjoys a lesser degree of First Amendment protection than does religious speech that is not intended to recruit new believers. The Supreme Court, however, has rejected the notion that speech about religion, religious speech designed to win converts, and religious worship by persons already converted should be treated differently under the First Amendment. Widmar, 454 U.S. at 269 n.6; see also Lamb's Chapel v. Center Moriches Union Free School District, 113 S. Ct. 2141, 2148 (1993) (describing the fear that proselytizing by a "radical" church might cause unrest as "difficult to defend as a reason to deny the presentation of a religious point of view about a subject the District otherwise makes open to discussion on District property"). The City's policy, then, restricts speech that is entitled full protection under the First Amendment.

### III. The Nature of the Forum

The government's ability to restrict protected speech by private persons on government property depends, in part, on the nature of the forum. Cornelius v. NAACP Legal Defense & Educ. Fund, 473 U.S. 788, 797 (1985). The three types of forums that may exist on government property are traditional public forums, designated public forums, and nonpublic forums. Id. at 802. Traditional public forums are places such as streets and parks that "by long tradition . . . have been devoted to assembly and debate." Perry Educ. Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 45 (1983). Designated public forums are those "created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." Cornelius, 473 U.S. at 802. Thus, designated public forums may be limited in terms of participants and in terms of subject matter. University facilities opened for meetings of registered student organizations qualify as a designated public forum, Widmar, 454 U.S. at 267-68, as do public school classrooms that are available to the general public outside of school hours for limited purposes, Lamb's Chapel, 113 S. Ct. 2141, 2146-47. In Rosenberger v. Rector & Visitors of Univ. of Va., 115 S. Ct. 2510 (1995), the Supreme Court treated a university's student activities fund as a designated public forum, albeit "more in a metaphysical than in a spatial or geographic sense." Id. at 2517. A nonpublic forum is government property that is not by tradition or designation a forum for public communication. Perry, 460 U.S. at 46.

The Bear Canyon Senior Center is a designated public forum. It may not be classified as a traditional public forum because it is not a traditional location of public debate or assembly. It is, however, a place that has been opened to the public for discussive purposes. The City has permitted lectures and classes on a broad range of subjects by both members and non-members at

its Senior Centers. The City limits this designated public forum in two ways. First, the City imposes an age requirement for participation, although this limitation is rather flexible where groups or spouses are involved. Second, the City limits the subject matter of presentations to topics "of interest to senior citizens." The subject matter limitation has also been extremely flexible in practice, as evidenced by the long list of diverse topics that have been presented in the past.

## IV. The Nature of the City's Restriction

Having classified the type of forum involved, we now turn to the type of restriction that the City has imposed. The Senior Center Policies and Procedures Manual from the City's Office of Senior Affairs includes the following directive: "It is prohibited to use any OSA facility for sectarian instruction or as a place for religious worship." The City contends that this policy is a restriction based upon content, not viewpoint, because it disallows all sectarian instruction and religious worship in its Senior Centers, regardless of the particular religion involved. The Supreme Court, however, has rejected similar arguments. In Lamb's Chapel, for example, the Court noted that the mere fact that a regulation categorically treats all religions alike does not answer the critical question of whether viewpoint discrimination exists between religious and non-religious expression. 113 S. Ct. at 2147. Here, the City had already opened the doors of its Senior Centers to presentations about religion, such as The Bible as Literature and Myths and Stories About the Millennium. The City allowed speakers at Senior Centers to discuss the Bible from a "strictly historical" perspective and to address religion as long as such presentations could be characterized as "a literature discussion or a philosophical discussion." The film Jesus dealt

with subject matter similar to that which would be included in a class on the Bible as literature. The film ran afoul of City policy, however, by advocating the adoption of the Christian faith. In contrast, a film about Jesus's life that ended on a skeptical note and urged agnosticism or atheism would not have contravened the City's policy. Because "[t]he prohibited perspective, not the general subject matter" triggered the decision to bar the private expression, Rosenberger, 115 S. Ct. at 2517, the City's policy is properly analyzed as a viewpoint-based restriction on speech.

Moreover, even if the City had not previously opened the Senior Centers to presentations on religious subjects, its policy would still amount to viewpoint discrimination. Any prohibition of sectarian instruction where other instruction is permitted is inherently non-neutral with respect to viewpoint. Instruction becomes "sectarian" when it manifests a preference for a set of religious beliefs. Because there is no nonreligious sectarian instruction (and indeed the concept is a contradiction in terms), a restriction prohibiting sectarian instruction intrinsically favors secularism at the expense of religion. Therefore, we conclude that the City's policy constitutes viewpoint discrimination.

### V.  The Appropriate Level of Judicial Scrutiny

The government bears a particularly heavy burden in justifying viewpoint-based restrictions in designated public forums. Viewpoint discrimination is "an egregious form of content discrimination." Rosenberger, 115 S. Ct. at 2516. Content-based restrictions are subject to strict scrutiny. See United States v. Kokinda, 497 U.S. 720, 726-727 (1990); Perry, 460 U.S. at 46. Viewpoint-based restrictions receive even more critical judicial treatment. As the Supreme Court noted in Rosenberger:

> The necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics. . . . [I]n determining whether the State is acting to preserve the limits of the forum it has created so that the exclusion of a class of speech is legitimate, we have observed a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations.

115 S. Ct. at 2516-2517 (citations omitted). While the Court did not explain what, precisely, the government must show in order to overcome this heavy presumption, it did indicate that the necessity of complying with another clause of the Constitution--the Establishment Clause--would excuse a viewpoint-based restriction on speech. Id. at 2520. We understand Rosenberger to mean that courts must examine viewpoint-based restrictions with an especially critical review of the government's asserted justifications for those restrictions. At a minimum, to survive strict scrutiny the City's policy must be "narrowly drawn to effectuate a compelling state interest." Perry, 460 U.S. at 46.

## VI. The City's Justifications for its Policy

The City offers three justifications for its policy prohibiting religious expression. First, the City asserts that the policy ensures conformity with the First Amendment's prohibition against state establishment of religion. While adherence to the Establishment Clause is a compelling government interest that may justify restrictions on speech in designated public forums, Rosenberger, 115 S. Ct. at 2520; Widmar, 454 U.S. at 270-71, the City's restriction is not necessary to serve this interest. The Supreme Court has made it abundantly clear that providing equal access to a designated public forum for citizens engaging in religious expression

- 9 -

and citizens engaging in secular expression does not violate the Establishment Clause. Rosenberger, 115 S. Ct. at 2520-25; Lamb's Chapel, 113 S. Ct. at 2148; Widmar, 454 U.S. at 270-75. The government need only remain neutral, preferring neither religious nor secular expression over the other. See Rosenberger, 115 S. Ct. at 2521-2522. Where the state does not sponsor the religious expression, the expression is made on government property that has been opened to the public for speech purposes, and permission is obtained through the same application process and on the same terms as secular groups, there is no violation of the Establishment Clause. Capitol Square Review and Advisory Bd. v. Pinette, 115 S. Ct. 2440, 2447 (1995). "[I]t is no violation for government to enact neutral policies that happen to benefit religion." Id. Clearly, the Establishment Clause does not compel the City to bar sectarian instruction and religious worship from its Senior Centers.

Second, the City asserts that its policy is necessary to remain in compliance with the Older Americans Act. To that end, the policy mirrors the language of the Older Americans Act, which requires as a condition for receiving federal funding assurances that a "facility will not be used and is not intended to be used for sectarian instruction or as a place for religious worship," 42 U.S.C. § 3027(a)(14)(A)(iv). The fact that the City's policy is designed to conform with federal statutory requirements, however, does not shelter it from constitutional scrutiny. A city or state's desire for federal funds is not a compelling government interest. Thus, compliance with the Older Americans Act does not justify this viewpoint-based restriction on expression. In the context presented here, no government entity may permissibly control the viewpoint being expressed. See Rosenberger, 115 S. Ct. at 2518-19 (where the government expends public funds to convey its own message, it may say what it wishes; where private speech is concerned, the

- 10 -

government may not restrict expression on the basis of viewpoint).

Third, the City asserts that its policy is necessary to protect the senior citizens who use its centers. The City argues that the senior citizens who use the Senior Centers are members of a "captive audience" who are "vulnerable" to "religious proselytizing and coercion." Br. Appellees 27. This claim is at best tenuous, and at worst insulting to senior citizens. People in this age group are not in need of special insulation from invitations to adopt a religious faith; nor are they, as a class, more likely than other citizens to be intimidated by such invitations. Moreover, the showing of the Jesus film and the distribution of giant-print New Testaments can hardly be construed as intimidating or coercive. People who choose to attend presentations at the Senior Centers do not become part of a captive audience: attendance at such programs is purely voluntary, and people are free to come and go as they please. Nor is there any implicit coercion to attend. This is not a situation akin to the school graduation ceremony at issue in Lee v. Weisman, where those who chose to absent themselves paid the price of missing "one of life's most significant occasions." 112 S. Ct. 2649, 2659 (1992). Shielding senior citizens from religious speech, then, is also an inadequate justification for the City's policy.

### VII. Tilton v. Richardson

Finally, we address the City's contention that Tilton v. Richardson, 403 U.S. 672 (1971), which primarily concerned an Establishment Clause challenge to statutory language similar to that in the Older Americans Act, should be read to uphold the City's policy against a free speech challenge. We reject this reading of Tilton. In that case, the Court considered a federal grant and loan program for the construction of academic facilities at institutions of higher learning. The

terms of the act excluded facilities used for sectarian instruction or religious worship. The Court held, however, that a provision in the act that effectively allowed facilities to be converted entirely to religious purposes after twenty years violated the Establishment Clause. Id. at 682-684. At no point did the Court address any free-speech challenge to the act, and nothing in the opinion implied that its decision upholding the remainder of the act against an Establishment Clause challenge could be extended to protect similar statutory language against a free-speech challenge. Furthermore, the Court revisited the Tilton case in Widmar and warned against such an expansive reading: "[N]othing in Tilton suggested a limitation on the State's capacity to maintain forums equally open to religious and other discussions. Cases before and after Tilton have acknowledged the right of religious speakers to use public forums on equal terms with others." 454 U.S. at 272 n.12.

## VIII. Conclusion

The City of Albuquerque has failed to show a compelling interest that justifies its policy prohibiting sectarian instruction and religious worship at its Senior Centers. For that reason, we hold that the policy is an unconstitutional restriction on expression. We therefore REVERSE the judgment of the district court and enjoin the City from barring the showing of the film Jesus and the distribution of New Testaments at its Senior Centers. We also award reasonable attorney's fees to the appellants in the district court and on appeal, as provided under 42 U.S.C. § 1988, and remand this matter to the district court for the determination of appropriate fee amounts.