**The BRONX HOUSEHOLD OF FAITH; Jack Roberts; Robert Hall, Plaintiffs–Appellants,**

**v.**

**COMMUNITY SCHOOL DISTRICT NO. 10; Charles Williams, in his official capacity as President of the Board of Education for Community School Board District No. 10; The Board of Education of the City of New York, Defendants-Appellees.**

**No. 1669, Docket 96–9633.**

United States Court of Appeals, Second Circuit.

Argued May 30, 1997.

Decided Sept. 15, 1997.

---

Jordan W. Lorence, Fairfax, VA (Joseph P. Infranco, Commack, NY, of counsel), for Plaintiffs–Appellants.

Stuart D. Smith, Assistant Corporation Counsel of the City of New York, New York City (Paul A. Crotty, Corporation Counsel, Barry P. Schwartz, Assistant Corporation Counsel, New York City, of counsel), for Defendants–Appellees.

(Marvin E. Frankel, Jeffrey S. Trachtman, Eric A. Tirschwell, Kramer, Levin, Naftalis, & Frankel, New York, NY, of counsel), for Amicus Curiae National Committee for Public Education and Religious Liberty.

(Jay Worona, General Counsel, Louis Grumet, Executive Director, New York State School Boards Association, Inc., Albany, NY, of counsel), for Amicus Curiae New York State School Boards Association, Inc.

(Steven T. McFarland, Kimberlee Wood Colby, Samuel B. Casey, Center for Law and Religious Freedom, Christian Legal Society, Annandale, VA, of counsel), for Amici Curiae Christian Legal Society, Christian Life Commission of the Southern Baptist Convention, Evangelical Lutheran Church in America, Family Research Council, Focus on the Family, and National Association of Evangelicals.

Before: VAN GRAAFEILAND, MINER and CABRANES, Circuit Judges.

MINER, Circuit Judge:

Plaintiffs-appellants The Bronx Household of Faith (the "Church"), an evangelical Christian church, and Jack Roberts and Robert Hall, its pastors, appeal from a summary judgment entered in the United States District Court for the Southern District of New York (Preska, J.) in favor of defendants-appellees Community School District No. 10 ("District # 10"), Charles Williams, President of the Board of Education of District # 10, and the Board of Education for the City of New York. The action was brought to challenge the refusal of defendants to permit the use of the gymnasium-auditorium of a District # 10 public school, the Anne Cross Mersereau Middle School ("M.S. 206B"), by the Church for weekly religious worship services. Originally filed in the Supreme Court of the State of New York, Bronx County, the complaint in the action set forth various claims pleaded under the provisions of 42 U.S.C. § 1983 and New York's declaratory judgment statute, N.Y. C.P.L.R. § 3001 (McKinney 1991): violation of the Free Speech, Free Exercise of Religion and Establishment of Religion Clauses of the First Amendment; violation of the Equal Protection Clause of the Fourteenth Amendment; and violation of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq.

District # 10 removed the action to the Southern District, where both sides moved for summary judgment. In granting summary judgment to the defendants, the district court rejected the First Amendment Free Speech claim after first determining that the Board of Education had created a limited public forum; that the restrictions imposed on the use of the forum were reasonably related to matters of legitimate government concern; and that the concern was to "preserv[e] and prioritiz[e] access to the middle school primarily for educational purposes and, secondarily, for nonexclusive public and community activities." The court dismissed the remaining claims without analysis. On appeal, the appellants advanced the same arguments that they advanced before the district court. We affirm the dismissal of the Free Speech claim but disagree with the district court's analysis of "nonexclusive use." We also reject the claims unaddressed by the district court.

## BACKGROUND

The use of school property for the purposes of religious worship is not among the uses designated by the New York Legislature for public schoolhouses and school grounds in New York State. However, New York Education Law does permit local school districts to adopt regulations permitting the use of such property for a great number of

other purposes: educational instruction; public libraries; social, civic and recreational meetings and entertainments, and other community welfare uses, provided such uses are "non-exclusive and open to the general public"; meetings where admissions fees are charged, if the fees are expended for charitable or educational uses except for the uses of religious sects or certain exclusive societies; polling places; civic forums and community centers; classes for instruction of mentally retarded minors; recreation, physical training and athletics; child care services when school is not in session; and "graduation exercises held by not-for-profit elementary and secondary schools, provided that no religious service is performed." N.Y. Educ. Law § 414 (McKinney 1988 & Supp.1997).

Pursuant to § 414, the New York City Board of Education has established a written policy governing the use of school buildings and school grounds under its jurisdiction. The policy is entitled "Standard Operating Procedures: Topic 5: Regulations Governing The Extended Use of School Facilities" ("SOP"). The SOP provides that the primary use of school premises is for Board of Education activities, and that the next preference will be given to community, youth and adult group activities. The SOP then specifies the following additional categories of permitted uses for school premises in the City of New York:

5.6.1 For the purpose of instruction in any branch of education, learning or the arts; examinations; graduations.

5.6.2 For holding social, civic and recreational meetings and entertainments, and other uses pertaining to the welfare of the community; but such uses shall be non-exclusive and open to the general public.

5.6.3 For polling places for holding primaries, elections and special elections for the registration of voters; and for holding political meetings where representatives of different viewpoints may be heard; but no meetings sponsored by political organizations shall be permitted un-

less expressly authorized by a vote of the Board of Education.

5.6.4 For civic forums and community centers in accordance with applicable law.

5.6.5 For recreation, physical training and athletics, including competitive athletic contests of children attending nonpublic, nonprofit schools.

Most pertinent to the appeal before us are the provisions of SOP 5.9:

No outside organization or group may be allowed to conduct religious services or religious instruction on school premises after school. However, the use of school premises by outside organizations or groups after school for the purposes of discussing religious material or material which contains a religious viewpoint or for distributing such material is permissible.

District # 10, a public school district in the Borough of Bronx, New York City, is subject to the jurisdiction of the New York City Board of Education. M.S. 206B is a middle school facility within District # 10, with students ranging in age from 9 through 12 in grades 5 through 7. The parties agree that the use of District # 10 property is governed by the SOP and that the following organizations were permitted to use District # 10 facilities for the following purposes during the 1994–95 school year: ACAP, Inc., for a program of training and drill exercises for young people between the ages of 10 and 21; Alliance for Education, for tutoring students ages 9–12 in math and English; Boy Scouts, for training of adolescent boys in various skills, including camping and first aid; Bronx School of Music, a private school, for a concert performed by its students; Bronx YMCA, for an after-school program to tutor students ages 7–13 in math, reading and English; Bronx Youth Service, for an after-school study center tutoring students ages 7–13 in math and English; Crotona Coalition, for workshops for students on subjects such as drugs and AIDS; Edgemont Day Care, for a first aid and CPR course for its staff workers; Girl Scouts, for training girls in skills and character, including instruction in crafts, reading and other matters; Grace Lutheran Church, for a program on Black His-

tory Month; Greek Orthodox Community of Riverdale, for an afternoon school to teach young people the Greek language and history; Kingsbridge Heights, for an after-school program for students, including supervised homework assistance and instruction in dance and computer classes; Mosholu Community, for a school program for students including job preparation for teenage students and computer classes; Mount Hope Housing, for a leadership training program and other programs for students; Pius XII Beacon, for programs including after-school tutoring and character training, with no religious content; RDK West Camps, for the operation of youth programs, including crafts, movies and games; Riverdale Community Center, for adult education classes that prepare adults to take and pass the GED exam and for after-school care and training for young people ages 7–13; South Fordham, for an after-school program for youth; and West African Association, for a concert combining ethnic music and theater.

On one occasion in 1994 and on another occasion in 1995, the Church rented the M.S. 206B building for programs of sports and games. The Church also rented the building once in 1995 for a banquet. However, the request by the Church to rent the gymnasium at M.S. 206B "for the purpose of conducting church worship services" each Sunday was denied. In his letter to Frank Pagliuca, a District # 10 official, seeking approval for the request, Pastor Hall noted that the services would include "hymn singing, communion, Bible reading, Bible preaching and teaching." After permission was denied by Mr. Pagliuca on the basis of the SOP provision prohibiting the after-school use of school facilities by outside organizations for religious services or instruction, Pastor Hall wrote to District # 10 Superintendent Irma Zardoya. He advised Superintendent Zardoya that the Church "is a Christian church of the historic Biblical persuasion," that use of the M.S. 206B facility was necessary because of overcrowding in the Church's present meeting location and that SOP 5.9 was unconstitutional. He concluded his letter by asking that his request for use of the school facilities be reconsidered. The permit appli-

cation again was denied, and the action giving rise to this appeal ensued.

In the Joint Stipulated Facts submitted to the district court, the parties stipulated as follows:

Community School District 10 has consistently followed Policy 5.9 by never renting school facilities to non-school groups or organizations, including Bronx Household of Faith, for the purpose of conducting religious worship services and religious instruction on school premises.

## DISCUSSION

### I. The Freedom of Speech Claim

#### A. Nature of the Forum

■ Freedom to speak on government property is largely dependent on the nature of the forum in which the speech is delivered. The Supreme Court has identified three types of forums: the traditional public forum; the designated public forum, sometimes called the "limited public forum"; and the nonpublic forum. See Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 802, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985). Traditional public forums include streets, parks and places that "by long tradition . . . have been devoted to assembly and debate." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). Restrictions of speech on such property are "subject to the highest scrutiny" and "survive only if they are narrowly drawn to achieve a compelling state interest." International Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678, 112 S.Ct. 2701, 2705, 120 L.Ed.2d 541 (1992).

Limited public forums are "created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." Cornelius, 473 U.S. at 802, 105 S.Ct. at 3448; see also Travis v. Owego–Apalachin Sch. Dist., 927 F.2d 688, 692 (2d Cir.1991). But restrictions on access based on speaker identity and subject matter are permissible only if "the distinctions drawn are reasonable in light of the purpose served

by the forum and are viewpoint neutral." *Cornelius,* 473 U.S. at 806, 105 S.Ct. at 3451 (citing *Perry Educ. Ass'n,* 460 U.S. at 49, 103 S.Ct. at 957). Where the proposed use falls outside of the limited forum, "the State is subject to only minimal constitutional scrutiny." *Fighting Finest, Inc. v. Bratton,* 95 F.3d 224, 229 (2d Cir.1996).

A nonpublic forum is government property that has not been opened for public speech either by tradition or by designation. *See Perry,* 460 U.S. at 46, 103 S.Ct. at 955. In such a forum, the government may make "distinctions in access on the basis of subject matter and speaker identity." *Id.* at 49, 103 S.Ct. at 957.

Appellants first contend that M.S. 206B is an open public forum from which their religious worship and religious teaching activities cannot be excluded absent a compelling state interest. In support of this contention, appellants rely on *Lamb's Chapel v. Center Moriches Union Free School District,* 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993), in which they say that "the U.S. Supreme Court dropped an anvil-like hint that it thought this Court was incorrect in ruling that no open forum existed in that case." *Cf. Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 959 F.2d 381, 388 (2d Cir. 1992). The "hint" to which appellants refer was the Supreme Court's statement in *Lamb's Chapel* that "[t]he argument [for an open forum] has considerable force, for the District's property is heavily used by a wide variety of private organizations, including some that presented a 'close question,' which the Court of Appeals resolved in the District's favor, as to whether the District had in fact already opened its property for religious uses." 508 U.S. at 391, 113 S.Ct. at 2146. An argument that has "considerable force" in one case may not have quite the same force in another, however. Also, an argument of considerable force is not necessarily a winning argument. In any event, the Supreme Court in *Lamb's Chapel* specifically declined to rule on the open forum question, stating that "even if the courts below were correct in this respect—and we shall assume for present purposes that they were—the judgment below must be reversed." *Id.* at 391–92, 113 S.Ct. at 2146–47.

In *Lamb's Chapel,* an evangelical church sought permission to use public school facilities in Center Moriches, New York, to show a six-part film series on Child Rearing and Family Issues. The series was said to emphasize traditional Christian family values and thereby was designed to counteract the undermining influences of the media. Relying on the state education law and local rules similar to those adopted by the New York City Board of Education specifying permissible uses, the Center Moriches School District denied use of school premises for the film series. The rule prohibiting religious uses was even more stringent than the prohibition imposed by the New York City Board of Education. It provided that "[t]he school premises shall not be used by any group for religious purposes." *See id.* at 387, 113 S.Ct. at 2144 (alteration in *Lamb's Chapel*). In reversing this Court, and in allowing the use sought, the Supreme Court concluded that the rule in question was unconstitutionally applied. In arriving at that conclusion, the Court found:

> There is no suggestion ... that a lecture or film about child rearing and family values would not be a use for social or civic purposes otherwise permitted.... That subject matter is not one that the District has placed off limits to any and all speakers. Nor is there any indication ... that the application to exhibit the particular film series involved here was, or would have been, denied for any reason other than the fact that the presentation would have been from a religious perspective. In our view, denial on that basis was plainly invalid....

*Id.* at 393–94, 113 S.Ct. at 2147–48. What the Court therefore found unacceptable was the fact that the film series, dealing with subject matter otherwise permissible under the school district's rule, was blocked solely because it dealt with the subject matter from a religious viewpoint.

SOP 5.9, while prohibiting outside organizations from the after-school use of school premises in District # 10 for religious services or instruction, specifically permits use

by such organizations "for the purposes of discussing religious material or material which contains a religious viewpoint." Presumably, the showing of the film series described in *Lamb's Chapel* is permissible under the rules governing District # 10. What is not permitted under SOP 5.9 is the use of school premises for worship or religious instruction, and it is important to note that the parties have agreed that District # 10 never has rented school property for that purpose. This limitation is characteristic of a limited forum, for it represents the exercise of the power to restrict a public forum to certain speakers and to certain subjects. It would seem to go without saying that certain types of speech may be prohibited in public schools, even after school hours. M.S. 206B simply is not a place that has been devoted to general, unrestricted public assembly by long tradition or by policy or practice. *Cf. Gregoire v. Centennial Sch. Dist.,* 907 F.2d 1366, 1378–79, 1382 (3d Cir.1990) (permitting indiscriminate access to high school facility created open forum so as to allow use of facility after school hours for religious speech and worship). It is not an open public forum as that term has been defined by the Supreme Court.

*Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), upon which appellants rely in connection with their arguments for an open forum, is inapposite. In that case, a student religious group was denied permission to use the facilities of a public university on the basis of the university's regulation prohibiting the use of buildings and grounds for religious worship or religious teaching. The Court found that the university had created a forum generally open for use by student groups. *See id.* at 267, 102 S.Ct. at 273. Accordingly, the Court applied the standard of review for content based exclusions—the need to show a compelling state interest and a regulation narrowly drawn to achieve that end—and found the standard unmet. A public university is, of course, much different from a public middle school in terms of traditional openness. *See id.* at 267 n. 5, 102 S.Ct. at 273 n. 5 ("This Court has recognized that the campus of a public university, at least for its students, possesses many of the characteristics of a public forum."); *Healy v. James,* 408 U.S. 169, 180–81, 92 S.Ct. 2338, 2345–46, 33 L.Ed.2d 266 (1972) ("The college classroom with its surrounding environs is peculiarly the marketplace of ideas, and we break no new constitutional ground in reaffirming this Nation's dedication to safeguarding academic freedom." (quotation omitted)); *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311 (1957) (plurality opinion) ("The essentiality of freedom in the community of American universities is almost self-evident.").

The Supreme Court assumed a limited forum in *Rosenberger v. Rector & Visitors of University of Virginia,* 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), for the purpose of holding unconstitutional the denial of student activity fee funds to a newspaper with religious editorial viewpoints published by an on-campus religious group. Applying its holding in *Lamb's Chapel,* the Court reiterated the distinction to be made between discrimination against speech because of its subject matter, considered permissible to preserve the purposes of the limited forum, and viewpoint discrimination, considered impermissible if directed against speech within the limitations of the forum. *See id.* at 829–31, 115 S.Ct. at 2517. SOP 5.9 preserves that distinction by prohibiting religious worship and religious instruction by outside groups, a prohibition that state authorities consider necessary to preserve the purposes of the limited public school forum, and by specifically permitting religious viewpoint speech in relation to matters for which the public school forum is open.

■ The Equal Access Act cases cited by appellants are not helpful in defining the nature of the forum. While public secondary schools that receive federal financial assistance and maintain limited open forums are constrained by the Equal Access Act, 20 U.S.C. § 4071 *et seq.,* to afford official recognition to student religious groups desiring to conduct non-curricular activities, *see, e.g., Board of Educ. v. Mergens,* 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990); *Ceniceros v. Board of Trustees,* 106 F.3d 878 (9th Cir.1997); *Hsu v. Roslyn Union Free Sch. Dist. No. 3,* 85 F.3d 839 (2d Cir.), *cert. de-*

*nied,* —— U.S. ——, 117 S.Ct. 608, 136 L.Ed.2d 534 (1996); *Pope v. East Brunswick Bd. of Educ.,* 12 F.3d 1244 (3d Cir.1993), the Equal Access Act is inapplicable in the case before us. The *Mergens* line of cases also is inapposite because we are confronted here with the issue of whether an *outside* religious organization can be barred from the use of a middle school for worship on the basis of a regulation that bars religious services but permits speech from a religious viewpoint on subjects for which the forum is open.

Also to be distinguished is *Church on the Rock v. City of Albuquerque,* 84 F.3d 1273 (10th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 360, 136 L.Ed.2d 251 (1996). In that case, there was a request to show a film on the life of Jesus at a senior citizen center and the film included an invitation by the narrator to adopt the Christian religion and to join him in a prayer. That request was denied, a denial that the Tenth Circuit found discriminatory under the circumstances. The City that operated the center had adopted a regulation prohibiting the use of its senior citizen facilities "for sectarian instruction or as a place of religious worship." *See id.* at 1277. That regulation was promulgated pursuant to a federal statute providing federal funding conditioned on a similar prohibition. Relying on *Lamb's Chapel,* the Tenth Circuit found that the restriction was not viewpoint neutral, since the City's senior citizen centers had been opened to other public presentations regarding the Bible. *See id.* at 1279. In contrast, the forum in the case before us never has been opened to such presentations. The circumstances of the case before the Tenth Circuit therefore were closely akin to the circumstances presented in *Lamb's Chapel.* However, to the extent that the Tenth Circuit suggests that sectarian instruction would have been permissible "even if the City had not previously opened the Senior Centers to presentations on religious subjects," *id.,* we respectfully disagree with that dictum. Moreover, we think that it is reasonable to impose greater restrictions upon the use of a middle school as a public forum than upon the use of a senior citizen center for that purpose, even in connection with after-school use.

*B. Reasonableness and Viewpoint Neutrality*

■ Having identified the public forum of M.S. 206B as a limited one, we are confronted with the question of whether the rule prohibiting religious services and instruction is reasonable and viewpoint neutral. We were faulted in *Lamb's Chapel* for "utter[ing] not a word in support of [our] reasonableness holding," *Lamb's Chapel,* 508 U.S. at 393 n. 6, 113 S.Ct. at 2147 n. 6 in regard to the regulation in that case. We think that it is reasonable in this case for a state and a school district to adopt legislation and regulations denying a church permission to use school premises for regular religious worship. We think that it is reasonable for state legislators and school authorities to avoid the identification of a middle school with a particular church. We think that it is reasonable for these authorities to consider the effect upon the minds of middle school children of designating their school as a church. And we think that it is a proper state function to decide the extent to which church and school should be separated in the context of the use of school premises for regular church services. Education, after all, is a particularly important state function, and the use of school premises is properly a matter of particular state concern. Finally, it is certainly not unreasonable to assume that church services can be undertaken in some place of public assembly other than a public middle school in New York City.

With respect to the element of viewpoint neutrality, the regulation in question specifically permits any and all speech from a religious viewpoint. What it does not permit is religious worship services. The parties agree that M.S. 206B never has been made available for worship services to any outside group. The school, therefore, cannot be said to have been opened to indiscriminate public use either by policy or practice. The purposes for which the schools in District # 10 have been opened to outside organizations encompass a wide variety of civic and social uses, and any speech conducted in connection with those uses may be bottomed on a religious viewpoint. Worship and religious instruction are forms of speech and cannot be

prohibited in an open forum such as a public university. *See Widmar*, 454 U.S. at 269 n. 6, 102 S.Ct. at 274 n. 6. Indeed, religious worship services may well be considered the ultimate in speech from a religious viewpoint in an open forum. But the question is whether a distinction can be drawn between it and other forms of speech from a religious viewpoint that District # 10 has elected to allow in the limited forum of a public middle school. We think it can.

What SOP 5.9 is intended to do seems clear: it is intended to prohibit outside groups from using school premises after school for "religious services or religious instruction" while permitting such groups to use school premises for "discussing religious material or material which contains a religious viewpoint or for distributing such material." In adopting this language, it appears that the New York City Board of Education has attempted meticulously to comply with the teaching of *Lamb's Chapel*.

Appellants concede that what they seek is specifically prohibited by SOP 5.9. They seek to undertake at M.S. 206B on a regular basis the ceremonies, prayers, rites, rituals and religious forms commonly associated with religious services, as well as the teaching commonly associated with the promulgation of religious faith. According to Pastor Hall, the Church proposed to conduct "church worship services," which he described as "includ[ing] hymn singing, communion, Bible reading, Bible preaching and teaching." In short, what Pastor Hall was proposing was to conduct the religious activities that take place according to a prescribed form and order commonly known as religious services.

There is no question that District # 10 never permitted the use of its premises for these purposes. The District apparently has been prepared to allow the use of its premises for the discussion of religious material in a secular setting and to allow the discussion of secular matters from a religious viewpoint, although the record discloses no request for such use. The distinction between these uses on the one hand, and religious services and instruction on the other, is not difficult for school authorities to make. There is no indication that they have not maintained that distinction under a regulation that is not only reasonable in light of the purposes served by the forum but also is viewpoint neutral.

## C. Exclusive Use

■ Contrary to the district court, we find no significance for this case in the statutory and SOP provisions requiring that the use of school premises for meetings be non-exclusive. SOP 5.6.2 tracks the language of Education Law § 414, subd. 1(c) in permitting use for "social, civic and recreational meetings and entertainments" that are "non-exclusive and ... open to the general public." But religious services and instruction are not social, civic or recreational meetings or entertainments. In any event, there is no indication in the record that the Church's services and instruction are not open to the general public. The district court also notes that Standard Operating Procedure 2.11 tracks Education Law § 414, subd. 1(d) in permitting use of school premises for meetings where admission fees are charged, except if "such meetings are under the exclusive control ... of a religious sect or denomination." However, the record contains nothing about fees for admission to the Church's services. Finally, since the state statute does not include religious services or instruction among permitted uses of school property, and since the SOP specifically prohibits such uses, there is no need for concern about whether the religious uses are exclusive or non-exclusive here. The limitation on the use of the forum in question is clear, reasonable and viewpoint neutral, and that is all it needs to be to pass constitutional muster.

## II. The Establishment and Free Exercise Claims

■ The First Amendment to the United States Constitution, as applicable to the states under the Fourteenth Amendment, prohibits the enactment of any "law respecting an establishment of religion." Neither the State of New York nor the New York City Board of Education has adopted such a law with respect to the use of M.S. 206B. Appellants' establishment claim in this re-

gard seems to be based on the argument that the Board of Education *improperly invoked* the Establishment Clause to justify its ban on religious services and instruction. But as has been shown, there is no need for the Board of Education to rely on the Establishment Clause in limiting the use of the public school forum, since the distinctions drawn in the SOP are both reasonable in light of the permitted after-school uses of the forum and viewpoint neutral as well. The cases cited by appellants for the proposition that "[g]overnment can violate the Establishment Clause's neutrality principle by treating religion *worse* than other groups" are inapposite, because they pertain to traditional public forums, *see, e.g., Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753, 762–63, 115 S.Ct. 2440, 2447, 132 L.Ed.2d 650 (1995), or to a limited forum where the "viewpoint neutral" rule has been violated, *see, e.g., Lamb's Chapel,* 508 U.S. at 395, 113 S.Ct. at 2148.

■ The First Amendment also prohibits the enactment of any law "prohibiting the free exercise" of religion. Appellants contend that "[t]he School District flagrantly violates the Free Exercise Clause by singling out religious services and instruction for exclusion from its forum." To support this contention, appellants cite *Employment Division, Department of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), and *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). Each of these cases involved specific religious practices—the ingestion of peyote in *Smith* and animal sacrifice in *Church of the Lukumi.*

*Smith* involved a state law prohibiting the payment of unemployment benefits to persons discharged for misconduct. The law was applied in the case of employees of a drug rehabilitation organization who were discharged for the use of peyote at a ceremony of the Native American Church. The Supreme Court found that the state statute was a valid and neutral law of general applicability and properly enforceable as such. *See Smith,* 494 U.S. at 890, 110 S.Ct. at 1606.

In *Church of the Lukumi,* the municipal ordinances of the City of Hialeah prohibiting animal sacrifice were challenged by a church of the Santeria religion. The challenge was sustained by the Supreme Court on a finding that the ordinances were not neutral but rather had as their object the suppression of a central element of the Santeria religion. *See Church of the Lukumi,* 508 U.S. at 542, 113 S.Ct. at 2231. The Court also found that the ordinances were not of general applicability, *see id.* at 545–46, 113 S.Ct. at 2232–33 and could not survive strict scrutiny, *see id.* at 546–47, 113 S.Ct. at 2233–34.

The state statute and SOP under consideration in this case do not bar any particular religious practice. They do not interfere in any way with the free exercise of religion by singling out a particular religion or imposing any disabilities on the basis of religion. The members of the Church here are free to practice their religion, albeit in a location separate from M.S. 206B. "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Smith,* 494 U.S. at 877, 110 S.Ct. at 1598. That right has not been taken from the members of the Church.

### III. The Equal Protection Claim

■ Appellants rely upon *Police Department v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), to support their claim that the Equal Protection Clause of the Fourteenth Amendment does not allow the exclusion of religious worship services from the public schools. In *Mosley,* the challenged Chicago ordinance prohibited picketing on public streets near school buildings. In that case, the Court found that under the Equal Protection Clause and the First Amendment, the public street was a traditional public forum where content-based restrictions must be narrowly tailored to serve a compelling governmental interest. Again, appellants rely upon a case that pertains to a traditional public forum. Appellants contend that the strict scrutiny test should be applied in connection with the rules prohibiting religious worship services and instruction. However, there is no fundamental right that has been violated. Appellants say that the School District has infringed on the fundamental rights of freedom of speech and free-

dom of religion. There is no fundamental right of freedom of speech in a limited forum from which various types of speakers and subjects are properly excluded. Nor is the free exercise of religion a fundamental right in a properly limited public forum. *Cf. Fighting Finest,* 95 F.3d at 231. It is only when a traditional public forum "is opened up to assembly or speaking by some groups [that] government may not prohibit others from assembling or speaking on the basis of what they intend to say." *Mosley,* 408 U.S. at 96, 92 S.Ct. at 2290.

## IV. The Religious Freedom Restoration Act Claim

■ Appellants contend that the School District violated the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.,* by using a clear religious classification to deny access to the forum and thereby imposing a significant burden on the religious beliefs of the appellants. The threshold issue under the Act is whether religious practices have been substantially burdened. *See* 42 U.S.C. § 2000bb–1(a). A "substantial burden" under the Act is a government policy prohibiting religious adherents from engaging in conduct that is mandated by their faith. *See Bryant v. Gomez,* 46 F.3d 948, 949 (9th Cir. 1995). The denial of the use of public property for religious services would not seem to substantially burden religious exercise. In any event, this claim is moot, the Act having been held unconstitutional in *City of Boerne v. Flores,* —— U.S. ——, ——, 117 S.Ct. 2157, 2172, 138 L.Ed.2d 624 (1997). The Court in that case held that Congress had exceeded its Fourteenth Amendment powers when it passed the Act. *See id.* The Court remarked that the Act represented "a considerable congressional intrusion into the States' traditional prerogatives and general authority to regulate for the health and welfare of their citizens." *Id.* at ——, 117 S.Ct. at 2171. The traditional prerogatives and general authority of the State of New York to regulate for the health and welfare of its citizens should prohibit judicial interference with the establishment of a limited forum in New York schools from which after-school use for religious services and instruction may be barred.

## CONCLUSION

The judgment of the district court is affirmed in accordance with the foregoing.

JOSÉ A. CABRANES, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that in addressing the important free speech questions presented in this case, we must apply the level of scrutiny appropriate to governmental restrictions of speech in "limited public forums." Despite the fact that New York Education Law § 414 and school board policy opened the schools to a wide variety of different speakers, and despite the fact that the Supreme Court, analyzing the same statute under similar circumstances, found "considerable force" in the argument that such restrictions of speech "were subject to the same constitutional limitations as restrictions in traditional public forums," *see Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384, 391, 113 S.Ct. 2141, 2146, 124 L.Ed.2d 352 (1993), we are constrained by controlling precedents of this Court and the factual stipulations of the parties to find that the school facilities in this case constituted only a limited public forum. Governmental restrictions of speech in limited public forums will be upheld only if the restrictions are reasonable and viewpoint neutral. *See Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819, 829–31, 115 S.Ct. 2510, 2517, 132 L.Ed.2d 700 (1995).

I concur in the Court's judgment insofar as it holds the ban on "religious services" by Community School District No. 10 ("District") to be reasonable and viewpoint neutral. However, because I believe that the District's ban on "religious instruction" discriminates on the basis of viewpoint by allowing private groups to conduct after-school instruction on a wide array of topics only from a secular perspective, I dissent from that part of the Court's judgment upholding the ban on "religious instruction."

## I.

In *Deeper Life Christian Fellowship, Inc. v. Board of Education,* this Court adopted an

intermediate state court's construction of New York Education Law § 414, *see Trietley v. Board of Educ.*, 65 A.D.2d 1, 409 N.Y.S.2d 912, 915 (N.Y.App.Div.1978), that the use of New York schools is limited to nonreligious purposes, and therefore concluded that in enacting this statute the state intended to create only a limited public forum. 852 F.2d 676, 680 (2d Cir.1988) (*Deeper Life I*). Because *Trietley* was decided before the Supreme Court's landmark ruling in *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (holding that public university could not exclude religious worship and teaching from public forum), it may well be that the state court in *Trietley* based its decision on a now-outdated understanding of the Establishment Clause. Nevertheless, *Deeper Life I* was decided subsequent to *Widmar*, and its adoption of *Trietley*'s reading of § 414 was reaffirmed in *Deeper Life Christian Fellowship, Inc. v. Sobol*, 948 F.2d 79, 83 (2d Cir.1991) (*Deeper Life II*), and again in *Lamb's Chapel v. Center Moriches Union Free School District*, 959 F.2d 381, 387 (2d Cir.1992), *rev'd on other grounds*, 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993).

The Supreme Court in *Lamb's Chapel* described the very argument pressed by plaintiff in this case—that § 414 and school district policy created a fully-open public forum, not a limited public forum excluding religious uses—as having "considerable force." 508 U.S. at 391, 113 S.Ct. at 2146. However, the Court ultimately left unresolved the question whether a school that opens its facilities indiscriminately, except as to a very narrow class of excluded communicative uses, may still claim to have created only a limited public forum. *Id.* at 391–92, 113 S.Ct. at 2146. Therefore, in light of our obligation to follow the decisions of prior panels of this Court unless they have been overruled by a holding of the Supreme Court, *see Gold v. Feinberg*, 101 F.3d 796, 801 (2d Cir.1996) (holding of prior panel "can only be overruled by this Court sitting in banc or by a decision of the Supreme Court"), we are not free to follow the Supreme Court's strong suggestion, in what is concededly dicta, even though

it may amount to an "anvil-like hint," *see ante*, at 212 (quoting Appellant's Brief at 16).

In addition, we are foreclosed from exploring whether prior practices of the District in the instant case may have opened the forum to religious services or instruction, *see Travis v. Owego–Apalachin Sch. Dist.*, 927 F.2d 688, 693 (2d Cir.1991) (holding that where school has allowed its facilities to be used for particular category of activities, it creates forum that must remain open to category of activities "exemplified by the prior permitted use"), by the unusually sparse record in this case (covering uses of the school during only a single school year) and by the stipulation of the parties that the District "has consistently followed Policy 5.9 by never renting school facilities to non-school groups or organizations ... for the purpose of conducting religious worship services and religious instruction on school premises." Joint Stipulated Facts at 9.

Accordingly, I agree that in the circumstances presented here, SOP 5.9 must be judged by the standard reserved for restrictions on speech in limited public forums. We will uphold such restrictions if they are "reasonable in light of the purpose served by the forum," and they do not "discriminate against speech on the basis of its viewpoint." *Rosenberger*, 515 U.S. at 829–31, 115 S.Ct. at 2517 (internal citations and quotation marks omitted). Because I believe that the provision of SOP 5.9 banning "religious instruction" is viewpoint discriminatory under the Supreme Court's decisions in *Lamb's Chapel* and *Rosenberger*, I would hold that provision unconstitutional under the Free Speech Clause of the First Amendment to the United States Constitution.

**II.**

In *Lamb's Chapel*, the Supreme Court rejected as viewpoint discriminatory a school district's denial of a permit for a church-sponsored film series dealing with family and child-rearing issues from a religious perspective. 508 U.S. at 394, 113 S.Ct. at 2147. The school district, pursuant to New York Education Law § 414, had established a policy permitting school facilities to be used after school hours for "social, civic, and recreation-

al" purposes, but not for "religious purposes." *Id.* at 386–87, 113 S.Ct. at 2143–44. The Court found there to be "no suggestion . . . that a lecture or film about child rearing and family values would not be a use for social or civic purposes otherwise permitted by [school district policy]," *id.* at 393, 113 S.Ct. at 2147 nor "any indication . . . that the application to exhibit the particular film series involved here was, or would have been, denied for any reason other than the fact that the presentation would have been from a religious perspective," *id.* at 393–94, 113 S.Ct. at 2147–48. The denial of the permit therefore violated the principle that "the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Id.* at 394, 113 S.Ct. at 2147 (internal quotation marks omitted). The fact that the policy treated all religions alike was immaterial inasmuch as it discriminated between religious and secular viewpoints. *Id.* at 393, 113 S.Ct. at 2147.

The Court further explained that such viewpoint discrimination was impermissible, " 'provided that the defendants have no defense based on the [E]stablishment [C]lause,' " *id.* (quoting *May v. Evansville–Vanderburgh Sch. Corp.,* 787 F.2d 1105, 1114 (7th Cir.1986) (Posner, *J.*)), and the Court had "no trouble" dismissing any possible Establishment Clause defense. Since the film series would have been shown after school, would not have been sponsored by the school, and would have been open to the public, and since many other private groups had used school facilities in the past for a wide variety of purposes, the Court concluded that there was "no realistic danger that the community would think that the District was endorsing religion or any particular creed, and . any benefit to religion or to the Church would have been no more than incidental." *Id.* at 395, 113 S.Ct. at 2148.

Elaborating upon its *Lamb's Chapel* decision, in *Rosenberger* the Court held that the refusal by the University of Virginia ("UVA") to fund a religiously oriented student newspaper through the school's Student Activities Fund ("SAF"), while funding a wide variety of other student groups and publications

through SAF, also constituted viewpoint discrimination. 515 U.S. at 829–31, 115 S.Ct. at 2517. By denying funding to publications because they "primarily promot[e] or manifes[t] a particular belie[f] in or about a deity or an ultimate reality," *id.* at 836, 115 S.Ct. at 2520, UVA "required public officials to scan and interpret student publications to discern their underlying philosophic assumptions respecting religious theory and belief," *id.* at 845, 115 S.Ct. at 2525. This contravened the Free Speech Clause because "[t]he Government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* at 829, 115 S.Ct. at 2516 (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983)). Such viewpoint discrimination "is presumed impermissible when directed against speech otherwise within the forum's limitations." *Id.* at 830, 115 S.Ct. at 2517 (citing *Perry,* 460 U.S. at 46, 103 S.Ct. at 955).

Significantly for our purposes here, the Court expressly rejected the dissent's view that UVA could constitutionally undertake to distinguish between "works characterized by the evangelism of [the student newspaper] and writing that merely happens to express views that a given religion might approve," *id.* at 896, 115 S.Ct. at 2550 (Souter, *J.,* dissenting). *See id.* at 843–45, 115 S.Ct. at 2524 (majority opinion). The Court observed that "[w]ere the dissent's view to become law it would require the University . . . to scrutinize the content of student speech, lest the expression in question . . . contain too great a religious content. . . . That eventually raises the specter of governmental censorship, to ensure that all student writings and publications meet some baseline standard of secular orthodoxy." *Id.*

As in *Lamb's Chapel,* the Court in *Rosenberger* discerned no Establishment Clause defense for UVA's restriction on religious speech. The Court cited numerous cases firmly providing that the Establishment Clause does not bar the government from providing benefits to religious groups or speakers on an equal basis with other groups

and speakers. *See id.* at 837–43, 115 S.Ct. at 2521–23. Funding the newspaper would not have run afoul of the Establishment Clause because UVA had not " 'willfully fostered or encouraged' any mistaken impression that the student newspapers speak for the University." *Id.* at 841, 115 S.Ct. at 2523 (quoting *Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 764–66, 115 S.Ct. 2440, 2448, 132 L.Ed.2d 650 (1995)).

In light of these teachings of the Supreme Court, I conclude that the District's exclusion of religious instruction in the instant case is not viewpoint neutral. SOP 5.6.1 sweepingly authorizes use of school premises after hours "[f]or the purpose of instruction in any branch of education, learning or the arts." SOP 5.9, however, while allowing "discuss[ion][of] religious material or material which contains a religious viewpoint," bans "religious instruction on school premises after school." The net effect is to require schools to put a halt to any after-school instruction that "contain[s] too great a religious content," *Rosenberger,* 515 U.S. at 844, 115 S.Ct. at 2524. Where secular viewpoints on a subject are concerned, the District's policy allows private groups not only to discuss the subject, but to instruct others from their secular perspective without hindrance by public authorities. Where religious viewpoints on the same subject are detected, private groups may "discuss" but they may not "instruct." Far from properly treading the delicate line between discrimination based on subject matter or content and discrimination based on viewpoint, as the majority contends, *see ante,* at 213, the District's policy banning religious instruction, while at the same time allowing instruction on any subject of learning from a secular viewpoint, is an impermissible form of viewpoint discrimination. Indeed, the distinction that the District attempts to draw between instruction and discussion is akin to the distinction drawn by the dissent in *Rosenberger,* but rejected by the Court, between "evangelism" and speech "that merely happens to express views that a given religion might approve,"

*id.* at 896, 115 S.Ct. at 2550 (Souter, *J.,* dissenting). *See id.* at 843–45, 115 S.Ct. at 2524 (majority opinion).

The fact that in the instant case the parties agree that the District has previously allowed secular instruction related to "ethics" and "character," paradigmatic contexts for religious instruction, only underscores the likelihood that the District's policy on "instruction" will systematically suppress sectarian viewpoints. The record reveals that the District has in the past allowed the Boy Scouts to provide "ethical education based on the Scout Oath and Scout Law,"[1] and has permitted a group called "Pius XII Beacon," organized under Catholic Charities, to conduct after-school "character training for the students [which] had no religious content." Joint Stipulated Facts at 3, 5–6. That ethics may be taught from a secular perspective but not from a religious perspective effectively places the religious viewpoint at a disadvantage in the marketplace of ideas. If the State may escape the strictures of the Free Speech Clause by merely hindering the religious viewpoint, without banning it entirely (after all, the District still allows religious materials to be "discussed"), then the long line of cases teaching that public authority over private speech must be viewpoint neutral will be easily circumvented.

As in *Lamb's Chapel* and *Rosenberger,* moreover, the District's preference for secular instruction over religious instruction cannot be justified by an Establishment Clause defense. The ban on instruction from a religious perspective, far from being required by the Establishment Clause, if anything offends "the very neutrality the Establishment Clause requires." *Rosenberger,* 515 U.S. at 846, 115 S.Ct. at 2525. There is nothing in the record to suggest that by allowing religious instruction to take place after school hours on an equal basis with other forms of instruction the District would or could "willfully foster[ ] or encourage[ ] any mistaken impression" that the organizations conducting after-school religious instruction actually

---

1. Although the majority's recitation of the purposes for which the school has been used in the past describes the Boy Scouts as having conducted "training of adolescent boys in various skills,

including camping and first aid," *ante,* .at 210–11, it bears noting that the record also indicates that "ethical education" was included in the Boy Scouts' training. Joint Stipulated Facts at 3.

speak for the District, *Rosenberger*, 515 U.S. at 841–43, 115 S.Ct. at 2523 (internal quotation marks omitted). Because the District has opened itself up so widely to other outside organizations, *see ante*, at 210–11, while restricting use of school facilities by outside groups to after-school hours and weekends, there is "no realistic danger that the community would think that the District was endorsing religion or any particular creed," *Lamb's Chapel*, 508 U.S. at 395, 113 S.Ct. at 2148.

We are not the first court to reach the issue of prohibitions on religious, but not secular, instruction. The Court of Appeals for the Tenth Circuit recently held that the City of Albuquerque's ban on "sectarian instruction" in publicly run senior-citizen centers discriminated on the basis of viewpoint and therefore violated the Free Speech Clause. *See Church on the Rock v. City of Albuquerque*, 84 F.3d 1273, 1279 (10th Cir. 1996). That court held that "[a]ny prohibition of sectarian instruction where other instruction is permitted is inherently nonneutral with respect to viewpoint" and "intrinsically favors secularism at the expense of religion." *Id.*[2]

Because I conclude that the District's policy banning after-school religious instruction by outside groups, without banning instruction from secular viewpoints, discriminates on the basis of viewpoint, I would hold that it is unconstitutional under the Free Speech Clause of the First Amendment.

Unlike religious "instruction," there is no real secular analogue to religious "services," such that a ban on religious services might pose a substantial threat of viewpoint discrimination between religion and secularism. Indeed, the dictionary definition of the term "services" in this context suggests as much: "a) public worship b) any religious ceremo-

ny." Webster's New World Dictionary at 1226 (Prentice Hall 1994). Because "services" are by definition religious in nature, it does not appear that they could ordinarily be understood to serve as a vehicle for both religious and secular viewpoints. I am therefore satisfied—while recognizing that the line between permissible "content" discrimination and impermissible "viewpoint" discrimination "is not a precise one," *Rosenberger*, 515 U.S. at 831, 115 S.Ct. at 2517—that the District's ban on religious "services" in SOP 5.9 is best described as a form of "content" discrimination that does not favor one viewpoint over another. For this reason, I concur in so much of the majority's opinion as upholds the ban on religious worship.

I note, however, that I am more skeptical than the majority appears to be of the government's ability to draw distinctions between religious worship—or indeed religious instruction—and "other forms of speech from a religious viewpoint that District # 10 has elected to allow . . . ." *Ante*, at 215. In some circumstances, enforcement of the exclusion of religious "services" might lead to "excessive entanglement with religion," *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2110–11, 29 L.Ed.2d 745 (1971). *Cf. Rosenberger*, 515 U.S. at 843–45, 115 S.Ct. at 2524; *Board of Educ. v. Mergens*, 496 U.S. 226, 248, 110 S.Ct. 2356, 2370, 110 L.Ed.2d 191 (1990); *Widmar*, 454 U.S. at 270 n. 6, 102 S.Ct. at 274 n. 6. There may be cases in which the parties dispute whether or not a proposed activity for which permission to use school premises is denied actually constitutes religious instruction or worship, and the very act of making such classifications may deeply—and unconstitutionally—entangle public officials in essentially theological determinations. However, this issue does not arise in the instant case, as the parties have stipu-

---

**2.** I believe the majority is incorrect in referring to this clear holding as "dictum." *Ante*, at 214. The majority characterizes *Church on the Rock* as hinging upon the fact that "the City's senior citizen centers had been opened to other public presentations regarding the Bible," and attempts to distinguish the instant case on this basis. *Id.* However, the Tenth Circuit explicitly found that "even if the City had not previously opened the Senior Centers to presentations on religious subjects, its policy would still amount to viewpoint

discrimination." 84 F.3d at 1278. The Court found that "any" prohibition of religious instruction by outside groups where other instruction is permitted is "inherently" viewpoint discriminatory. *Id.* The fact that the court amplified upon this holding by explaining precisely how and why the ban unconstitutionally suppressed the religious viewpoint in that case does not detract from the court's holding that the ban was unconstitutional on its face.

lated that plaintiff seeks to use a school gymnasium for "religious worship services." Joint Stipulated Facts at 8–9.

### III.

In conclusion, while in the circumstances presented I concur in the judgment of the Court upholding the District's ban on religious services, I believe that the ban on religious instruction favors secular over religious viewpoints in violation of the Free Speech Clause of the First Amendment. I therefore respectfully dissent from that part of the judgment upholding the ban on religious instruction.