# UNITED STATES COURT OF APPEALS
## Tenth Circuit
## Byron White United States Courthouse
## 1823 Stout Street
## Denver, Colorado 80294
## (303) 844-3157

**Patrick J.  Fisher, Jr.**                                              **Elisabeth A. Shumaker**
**Clerk**                                                                **Chief Deputy Clerk**

January 14, 1998

**TO:**   ALL RECIPIENTS OF THE CAPTIONED OPINION

**RE:**   96-4191, *Summum v. Callaghan*
          November 28, 1997

Please be advised of the following correction to the captioned decision:

On page 28, note 18, in the first line of the slip opinion there is a typographical error.  The correct spelling of the author's name of the referenced journal article should be "Spiropoulos," and not "Spiropoulous" as it appeared in the slip opinion.

Please make the appropriate correction to your copy of the opinion.

Very truly yours,

Patrick Fisher, Clerk

Keith Nelson
Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 28 1997**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
## TENH CIRCUIT

SUMMUM, a Utah corporate sole,

     Plaintiff-Appellant,

v.

MARY CALLAGHAN; SALT LAKE COUNTY, a municipal government entity; JAMES BRADLEY, Salt Lake County Commissioner; BRENT OVERSON, Salt Lake County Commissioner; RANDY HORIUCHI, Salt Lake County Commissioner,

    Defendants-Appellees.

No. 96-4191

Appeal from the United States District Court
for the District of Utah
(D.C. No. 94-CV-906)

Brian M. Barnard (Natasha Hawley and Andrea J. Garland, with him on the briefs), Utah Legal Clinic, Cooperating Attorneys for Utah Civil Rights & Liberties Foundation, Inc., Salt Lake City, Utah, for Plaintiff/Appellant.

Patricia J. Marlowe, Deputy County Attorney (Douglas R. Short, Salt Lake County Attorney and Sirena M. Wissler, Deputy County Attorney, with her on the brief), Salt Lake City, Utah, for Defendants/Appellees.

Before **SEYMOUR**, Chief Judge, **MCKAY,** Senior Circuit Judge, and **HENRY**, Circuit Judge.

**SEYMOUR**, Chief Judge.

This appeal involves two consolidated actions brought under 42 U.S.C. § 1983 by Summum, a church, against Salt Lake County and its Commissioners ("the County") based on the County's denial of several requests made by Summum to erect a monolith displaying certain religious tenets of the Summum church near a Ten Commandments monolith located on the front lawn of the Salt Lake County Courthouse for the Third Judicial District. Summum alleges violations of the Establishment, Free Exercise, Free Speech, and Due Process Clauses of the United States Constitution and analogous provisions of the Utah Constitution.[1] The district court dismissed Summum's federal claims under Fed. R. Civ. P. 12(b)(6), and dismissed the pendent state law claims without prejudice. Summum appeals, and we reverse and remand for further proceedings.

---

[1]Summum also asserts claims under the Religious Freedom Restoration Act ("RFRA"). 42 U.S.C. §§ 2000bb *et seq.* The Supreme Court, however, recently held RFRA unconstitutional. *City of Boerne v. Flores*, 117 S. Ct. 2157 (1997). Therefore, we do not address these claims.

**I.**

Standing on the front lawn of the Salt Lake County Courthouse on property owned and controlled by the County is a stone monolith inscribed with, among other things, the Ten Commandments. This Ten Commandments monolith is approximately fifty-eight inches high and thirty-two inches wide, and is permanently installed in the grass next to the sidewalk leading to the main entrance of the courthouse. Thus, the monolith is in a prominent place and visible to all who enter the courthouse through the main entrance. The Order of Eagles, a private fraternal order, erected the Ten Commandments monolith in approximately 1971 with the approval of the County. The County specifically granted the Order of Eagles permission to install the monolith at a meeting of the County Commission. The Order of Eagles paid for both the creation and installation of the monolith.[2]

---

[2]In the early 1970s, residents and taxpayers of Salt Lake County sued both Salt Lake City and Salt Lake County alleging that the placement of the Ten Commandments monolith on the courthouse lawn violated the Establishment Clause and seeking its removal. We rejected plaintiffs' arguments and held that the monolith did not violate the Establishment Clause. *Anderson v. Salt Lake City Corp.*, 475 F.2d 29 (10th Cir. 1973)*, rev'g*, 348 F. Supp. 1170 (D. Utah 1972). Although we recognized the religious nature of the Ten Commandments, we also noted its "substantial secular attributes" as a precedent legal code and concluded that the "monolith is primarily secular, and not religious in character; that neither its purpose nor effect tends to establish religious belief." *Id.* at 33-34. Since *Anderson* was decided, however, more recent cases, including a Supreme Court case, casts doubt on the validity of our conclusion that the Ten Commandments

(continued...)

Summum is a church formed in Utah in 1975, and its main offices are located in Salt Lake City. On August 17, 1994, Summum mailed a letter to the Salt Lake County Commission requesting that Summum be allowed to place a stone monolith with its own religious tenets on the front lawn of the County courthouse near the Ten Commandments monolith. The proposed monolith would be comparable in size, shape, and design, and Summum would pay for all costs of creation and installation. Having received no response from the Commission, Summum sent a second letter on August 29. A few days later, Summum received a letter from Commission Chair James Bradley denying Summum's request on the ground that "the county and other government entities are in the process of examining that property for development of a new jail or other facilities and it would not be prudent to engage in any construction or development, of any kind, on that site at this time." Aplt. App. at 28.

At the time the events underlying this appeal took place, Salt Lake County Commissioners Brent Overson, Randy Horiuchi, Mary Callaghan, and James

[2](...continued)
monolith is primarily secular in nature. *See infra* note 8.

A more detailed description of the Ten Commandments monolith as well as the events leading to its installation can be found in both the district and appellate court opinions in *Anderson*. The Ten Commandments monolith is also inscribed with symbols representing the All Seeing Eye of God, the Star of David, the Order of Eagles, letters of the Hebraic alphabet, and Christ or peace. *Anderson*, 475 F.2d at 30.

Bradley, who are named defendants in this action, were vested with the administrative power to determine whether a private organization or individual could install a display on county property.[3]  The County does not have any written or unwritten rules, regulations, policies or practices governing the placement of permanent displays on county property to guide the Commissioners in making these decisions.  Nor has the County established an appeal process to challenge denials of such requests.

On September 16, 1994, Summum filed a complaint (*Summum I*) alleging that Salt Lake County and its Commissioners violated the Establishment, Free Exercise, and Due Process Clauses of the federal and state constitutions by denying Summum's requests to place its monolith on the courthouse lawn while allowing the Ten Commandments monolith to stand.  Summum sought monetary compensation and punitive damages, declaratory and injunctive relief as well as attorneys' fees and costs under 42 U.S.C. § 1983 and § 1988.[4]  The County moved to dismiss *Summum I* pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

---

[3]Commissioner James Bradley left office in December 1994 and was replaced by Commissioner Mary Callaghan.  Aplt. App. at 255.

[4]*Summum I* did not allege any causes of action for constitutional violations of the right to free speech or free expression.  Summum did, however, allege that the County had created a public forum on the courthouse lawn, and that by summarily denying Summum's request without establishing any standards or appeal process, the County had violated Summum's due process rights.

In an order dated January 5, 1995, the district court granted the County's motion to dismiss. Relying on our decision in *Anderson v. Salt Lake City Corp.*, 475 F.2d 29 (10th Cir. 1973), which held that the Ten Commandments monolith did not violate the Establishment Clause because it was primarily secular in nature, the district court dismissed Summum's Establishment Clause claims. The district court further reasoned that since the Ten Commandments monolith was secular, the County had not created a forum for religious expression by permitting the Order of Eagles to place their monolith on the courthouse lawn, and thus Summum had no right under the Free Exercise Clause to place its own monolith there. Moreover, since Summum had not been deprived of any protected interest, the court held that Summum's due process claims also failed. After dismissing all Summum's federal claims, the district court declined to exercise jurisdiction over the pendent state law claims and dismissed them without prejudice.

In the meantime, on December 19, 1994 and January 3, 1995, Summum made two new requests to the County for permission to erect a monolith displaying tenets of the Summum church on the courthouse lawn. In these requests, Summum specifically indicated that its purpose in installing the

monolith was to exercise its constitutional right to free speech. Summum received no response from the County to either of these letters.[5]

On or about January 12, 1995, Summum filed a motion to alter or amend judgment and a motion seeking leave to file an amended complaint, which was attached. The amended complaint added causes of action under the Free Speech Clause of the federal and state constitutions. It alleges that the County has created a public forum on the courthouse lawn and has violated Summum's state and federal free speech rights by (1) denying Summum's requests to install a monolith next to the Ten Commandments monolith; (2) leaving the decision as to who may place a permanent display on county property as well as the content of such displays to the unbridled discretion of the Commissioners named as defendants; and (3) seeking to censor Summum's ideas.

Summum supported these motions with supplemental authority provided by the Sixth Circuit's decision in *Pinette v. Capitol Square Review & Advisory Bd.*, 30 F.3d 675 (6th Cir. 1994), which was later affirmed by the Supreme Court, 515 U.S. 753 (1995).[6] According to Summum, *Capitol Square* held that private

---

[5]Summum also mailed letters to Salt Lake City making the same request. Salt Lake City responded in a letter stating that the County alone is responsible for making decisions as to the erection of displays or monuments on the courthouse lawn.

[6]While these motions were pending, the Supreme Court decided *Capitol Square* and Summum brought this decision to the district court's attention as

(continued...)

religious speech was fully protected under the Free Speech and Free Exercise Clauses and that under these constitutional guarantees, "private speech may not be banned from a secular public forum because . . . the speech is religious." Aplt. App. at 203. In light of *Capitol Square*, Summum argued that the district court erred in dismissing the free exercise claims in *Summum I* on the ground that a *religious* forum had not been created on the courthouse lawn because of the secular nature of the Ten Commandments monolith. Summum contended under *Capitol Square* that regardless of whether a public forum is characterized as religious or secular, when the government denies private religious speech equal access to *any* public forum it violates the Free Exercise Clause. Summum also asserted that *Capitol Square* supported its motion to amend the complaint by showing the strength of Summum's potential free speech claims. Summum requested that the district court reconsider its dismissal of *Summum I* and proceed with the amended complaint.

Subsequently in August 1995, Summum filed a new and separate complaint against the County (*Summum II)* asserting causes of action essentially identical to the amended complaint. The County moved to dismiss *Summum II* on the ground of *res judicata.*

---

[6](...continued)
supplemental authority in further support of the pending motions.

The two actions were consolidated. In an order dated June 10, 1996, the district court ruled on Summum's motion to alter or amend the judgment in *Summum I* and the County's motion to dismiss *Summum II*. In addressing Summum's motion to alter or amend, the district court elaborated on and clarified its previous order dismissing *Summum I*. The court stated that Summum's reliance on *Capitol Square* was misplaced because the Supreme Court had "accepted as a predicate matter" that the government property in question was a public forum, while the issue in the instant case was whether a public forum had in fact been created. Aplt. App. at 230-31. The district court was persuaded the County had not created a public forum simply by allowing one private organization access to the courthouse lawn. Because *Capitol Square* did not shed light on whether a public forum had been created, and because in the district court's view the courthouse lawn fell "squarely" into the category of a nonpublic forum, *id*. at 231, the court denied Summum's motion to alter or amend the judgment in *Summum I*. The district court dismissed *Summum II* on the grounds of *res judicata*, having previously observed that *Summum II* is "in essence, the proposed amendment to the Summum I complaint." *Id.* at 229. The court also observed that Summum's free speech claim was a close companion to its free

exercise claim and, as a matter of law, fell within the court's conclusion that the

County courthouse lawn was not a public forum.[7]

---

[7]The County argues that since the district court dismissed the free speech claims in *Summum II* under the doctrine of *res judicata*, our only duty is to review *de novo* the *res judicata* determination, and we need not discuss the substance of the free speech claims made in *Summum II*. Summum, on the other hand, contends the district court directly ruled on the merits of the free speech claims in denying the motion to alter or amend judgment in *Summum I* and in dismissing *Summum II*, and therefore these claims are properly before us on appeal.

The convoluted procedural posture of this appeal stems from the district court's failure to grant Summum leave to amend the complaint in *Summum I* to include free speech claims. Summum made two attempts to amend the complaint before filing *Summum II*. The court denied Summum's first motion to amend in its order dismissing *Summum I* on the ground that it was submitted without supporting authorities in violation of a local district court rule. Summum once again tried to amend the complaint to add free speech claims under new Supreme Court authority, but the court never explicitly ruled on the second motion. After waiting over seven months for the court to render a decision, Summum filed *Summum II* and a notice of withdrawal of its motion to amend the complaint in *Summum I* as moot. Considering the liberal pleading standards under the federal rules, Summum should have been allowed to amend its complaint in *Summum I*, thereby avoiding altogether the *res judicata* problem presently before this court. *See* 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357, at 360-67 (2d ed. 1990) (observing that dismissal under 12(b)(6) is generally not final and court will ordinarily give plaintiff leave to file an amended complaint).

In any event, the district court directly considered the free speech issues raised in the amended complaint. The court recognized that *Summum II* was in essence the amended complaint; that the free speech claim was closely related to the free exercise claim; that it had already held no public forum had been created in deciding Summum's free exercise claim, and therefore Summum's free speech claim also failed as a matter of law. In light of the district court's actions, we will treat the amended complaint in *Summum I* as if it were before the district court and before us as well.

In sum, while we agree with the County that *Summum II* was properly dismissed on *res judicata* grounds, we also hold Summum's free speech claims

(continued...)

## II.

We turn first to Summum's free speech claims, and more specifically, to whether Summum has stated a cause of action under the Free Speech Clause.[8] This court reviews *de novo* a district court's dismissal of a complaint pursuant to

---

[7](...continued)
are properly before us in the form of the amended complaint.

[8]Summum urges us to overrule our decision in *Anderson v. Salt Lake City Corp.*, 475 F.2d 29 (10th Cir. 1973), and hold that the County has violated the Establishment Clause by denying Summum's requests while allowing the Ten Commandments monolith to stand. We are not at liberty to overrule or disregard the precedent of an earlier panel absent en banc reconsideration or a superseding contrary decision of the United States Supreme Court. *LeFever v. Commissioner of Internal Revenue*, 100 F.3d 778, 787 (10th Cir. 1996). Because we believe that Summum has stated a cause of action under the Free Speech Clause of the federal constitution, and reverse and remand on these grounds, we need not reach Summum's Establishment Clause claims here. We note, however, that our decision in *Anderson* has been called into question by the Supreme Court in *Stone v. Graham,* 449 U.S. 39 (1980) (per curiam) (holding statute requiring posting of Ten Commandments in public school classrooms violates Establishment Clause). In *Stone*, the Court observed:

> The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact. The Commandments do not confine themselves to arguably secular matters, such as honoring one's parents, killing or murder, adultery, stealing, false witness, and covetousness. . . . Rather, the first part of the Commandments concerns the religious duties of believers: worshipping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day.

*Id.* at 41-42 (footnote and citation omitted).

Fed. R. Civ. P. 12(b)(6). *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 (10th Cir. 1997). We "'must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff.'" *Id.* (quoting *Roman v. Cessna Aircraft Co.*, 55 F.3d 542, 543 (10th Cir. 1995)). We will uphold a Rule 12(b)(6) dismissal "'only when it appears that the plaintiff can prove no set of facts in support of the claims that would entitle him to relief.'" *Yoder v. Honeywell Inc.*, 104 F.3d 1215, 1224 (10th Cir. 1997) (quoting *Fuller v. Norton*, 86 F.3d 1016, 1020 (10th Cir. 1996)), *cert. denied*, 118 S. Ct. 55 (1997). Finally, we keep in mind that "granting such a motion to dismiss is a 'harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice.'" *Ramirez v. Oklahoma Dep't of Mental Health*, 41 F.3d 584, 586-87 (10th Cir. 1994) (quoting *Morgan v. City of Rawlins*, 792 F.2d 975, 978 (10th Cir. 1986)).[9]

We begin by noting the "'crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect.'"[10]

---

[9]Because our review is confined to allegations made in the amended complaint, *see Klein v. Zavaras,* 80 F.3d 432, 434 (10th Cir. 1996), we deny Summum's motion for leave to file a video tape as part of the record on appeal.

[10]Cases concerning private religious speech on government property are usually resolved under the Free Speech Clause and generally invoke the Free Exercise Clause simply to note that private religious speech is protected under

(continued...)

*Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 765 (1995)

(quoting *Board of Educ. of Westside Community Sch. v. Mergens*, 496 U.S. 226,

250 (1990)).  In *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788

(1985), the Supreme Court set out a three-step framework for analyzing the

constitutional protections afforded to private speech on government property.

First, we must determine whether Summum's proposed monolith is protected

speech, for if it is not protected the analysis ends here.  Second, we must analyze

whether the courthouse lawn is a public or nonpublic forum because the extent to

which the County may limit access to this property--*i.e.*, whether a heightened or

reasonableness standard applies--depends on its categorization.  Finally, we must

assess whether the County's justifications for excluding Summum from the

courthouse lawn satisfy the requisite standard.  *Id*. at 797.

## A.  Protected Speech

The first step is easily disposed of when, as here, the speech in question is

private religious speech.  The Supreme Court has unequivocally stated that

---

[10](...continued)
both the Free Speech and Free Exercise Clauses of the First Amendment.  *See Widmar v. Vincent*, 454 U.S. 263, 273 n.13 (1981).  Since Summum's claims implicate free speech rights, and "it is on the bases of [these] rights that we decide the case," "we need not inquire into the extent, if any, to which free exercise interests are infringed" by the County's denial.  *Id.*

"private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression." *Capitol Square*, 515 U.S. at 760.

## B. Nature of Forum

Turning to the second step, the Supreme Court has recognized three distinct categories of government property: (1) traditional public fora; (2) designated public fora; and (3) nonpublic fora. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46 (1983). Summum does not argue that the courthouse lawn is a traditional public forum.[11] Aplt. Reply Br. at 11. Summum instead contends that the courthouse lawn is a "limited public forum." *Id.* at 11-12. As we discuss more fully below, there is some confusion over this term in the case law. It is not clear whether Summum uses "limited public forum" to refer to a designated public forum that is subject to heightened scrutiny, or to a nonpublic

---

[11]A traditional public forum consists of places such as "streets and parks, which have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Educ. Ass'n*, 460 U.S. at 45 (internal quotations omitted). In a traditional public forum, content-based regulations are subject to heightened scrutiny, *i.e.*, the government must show that the regulation is "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Id.* Content-neutral regulations must be "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.*

forum that is subject to a reasonableness standard. Summum's (and the district court's) confusion is readily understandable in light of the inconsistent manner in which the Supreme Court itself has used this term. We must therefore clarify precisely how Summum defines "limited public forum" in order to assess the sufficiency of its amended complaint.

### 1. Designated Public Forum

A designated public forum is property the government has opened for expressive activity, treating the property as if it were a traditional public forum. A designated public forum may be created for a "limited purpose" for use "by certain speakers, or for the discussion of certain subjects." *Perry Educ. Ass'n*, 460 U.S. at 45-46 & n.7 (citations omitted); *see also Cornelius*, 473 U.S. at 802. For example, "[u]niversity facilities opened for meetings of registered student organizations qualify as a designated public forum." *Church on the Rock v. City of Albuquerque*, 84 F.3d 1273, 1278 (10th Cir.) (citing *Widmar v. Vincent*, 454 U.S. 263, 267-68 (1981)), *cert. denied*, 117 S. Ct. 360 (1996).

Unlike a traditional public forum, the government "is not required to indefinitely retain the open character" of a designated public forum. *Perry Educ. Ass'n*, 460 U.S. at 46. However, as long as the property is designated as a public forum, the government is "bound by the same standards as apply in a traditional public forum." *Id.* Thus, content-based regulations must be narrowly drawn to

effectuate a compelling state interest and reasonable time, place, and manner regulations are permissible. *Id.*

Sometimes included within this category of designated public forum is property referred to as a "limited public forum." In *Widmar v. Vincent*, 454 U.S. 263 (1981), for example, the Supreme Court held that a state university had created a "limited public forum," *id*. at 272, by making its facilities generally available for the activities of registered student groups, and applied the strict scrutiny test to the university's decision to exclude a religious student group from using its facilities, *id*. at 269-70. Thus, in *Widmar*, the term "limited public forum" was used specifically to denote a particular sub-category of the designated public forum--a designated public forum for a limited purpose for use by certain speakers, *i.e.*, registered student groups.

In more recent cases, however, the Court has used the term "limited public forum" to describe a type of nonpublic forum and has applied a reasonableness standard under which the state may restrict speech "so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral."[12] *Cornelius*, 473 U.S. at 806. For example, in *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995), the Court, as in *Widmar*, held a state university had created a "limited public forum," *id*. at 829,

---

[12]*See* part B2, *infra*.

by allowing a wide spectrum of registered student groups access to a student activities fund. In contrast to *Widmar*, however, the Court applied a reasonableness test to the university's decision to exclude a Christian student news publication from receiving money from the fund. *Id.* at 829-30. Similarly, in *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993), the Court accepted the lower courts' holding that the school district had created a "limited public forum," *id.* at 390, by allowing various private organizations access to school property, and went on to apply a reasonableness standard to the school district's exclusion of a church from showing a film on school property, *id.* at 393-94.

Our review of the record and briefs persuades us that Summum does not use "limited public forum" to mean property which falls within the category of a designated public forum. In determining whether the government has created a designated public forum, courts must examine several factors, including (1) the purpose of the forum; (2) the extent of use of the forum; and (3) the government's intent in creating a designated public forum. *See generally* 1 RODNEY A. SMOLLA, SMOLLA AND NIMMER ON FREEDOM OF SPEECH § 8:10-8:14 (3d ed. 1996).[13] Nowhere in the amended complaint does Summum allege facts

---

[13]The purpose element requires "consideration of a forum's special attributes [which] is relevant to the constitutionality of a regulation since the

(continued...)

pertaining to the purpose or any special attributes of the courthouse lawn which make it compatible with extensive expressive activity; the extent to which the County uses the courthouse lawn as a place for expressive activity; or the County's intent to open up the courthouse lawn to expressive activity by the general public, certain speakers, or certain topics.

Indeed, as Summum points out, the only facts it alleges to support its assertions that the County's actions have established a public forum are that the Ten Commandments monolith has stood on the courthouse lawn on property

---

[13](...continued)
significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved." *Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650-51 (1981).

The extent-of-use requirement is not satisfied merely when some speakers are allowed access to government property. *See United States v. Kokinda*, 497 U.S. 720, 730 (1990) (plurality opinion); *Perry Educ. Ass'n*, 460 U.S. at 47; *Greer v. Spock*, 424 U.S. 828, 836 (1976); *Brown v. Palmer*, 944 F.2d 732, 734 (10th Cir. 1991) (en banc). Something more than "selective access" or "limited discourse" is required. *Cornelius*, 473 U.S. at 802, 805. The government must allow "general access" to, *id.* at 803, or "indiscriminate use" of, *Perry Educ. Ass'n*, 460 U.S. at 47, the forum in question whether by the general public, certain speakers, or for certain subjects.

Finally, the government intent element is satisfied only when the government "intentionally open[s] a nontraditional forum for public discourse." *Cornelius*, 460 U.S. at 802. The Court identified two factors to help it discern intent: (1) the policy and practice of the government; and (2) the nature of the property and its compatibility with expressive activity. *Id.* Thus, the Court expressed its reluctance to find a designated public forum where "the principal function of the property would be disrupted by expressive activity" or where government policy or practice reveals criteria to selectively limit access. *Id.* at 803-05.

owned by the County since 1971. Aplt. Reply Br. at 10-11 & n. 1. Summum contends the placement of this monolith on government property is enough to create a limited public forum. *Id*. at 10. As the district court correctly observed, a designated public forum (even the limited purpose variety) cannot be created simply by allowing one private organization access to the forum. *See Brown v. Palmer*, 944 F.2d 732, 734 (10th Cir. 1991) (en banc); *see also supra* note 12. Clearly Summum cannot be arguing that the courthouse lawn is a designated public forum. The district court's conclusion that a designated public forum has not been created, however, fails to address the more pertinent question whether a "limited public forum"--in the sense that Summum and the Court in *Rosenberger* and *Lamb's Chapel* define that term under the category of a nonpublic forum--has been created. It is to this third category that we now turn.[14]

## 2. Nonpublic Forum

---

[14]We recognize that the boundary between a designated public forum for a limited purpose (*e.g.*, *Widmar*) and a limited public forum (*e.g.*, *Rosenberger* and *Lamb's Chapel*) is far from clear. Because we conclude that Summum is not alleging that a designated public forum has been created, we do not have to clarify the precise distinctions between the two. We simply note that a designated public forum for a limited purpose and a limited public forum are not interchangeable terms. We use the term "limited public forum" here to denote a particular species of nonpublic forum, in accordance with the manner in which Summum, the Supreme Court in *Rosenberger* and *Lamb's Chapel*, and some commentators define that term. *See, e.g.*, 1 SMOLLA, *supra*, § 8:8, at 8-5; Andrew C. Spiropoulos, *The Constitutionality of Holiday Displays on Public Property (Or How the Court Stole Christmas)*, 68 OKLA. B.J. 1897, 1901 n.29 (1997).

The final category--the nonpublic forum--consists of "[p]ublic property which is not by tradition or designation a forum for public communication." *Perry Educ. Ass'n*, 460 U.S. at 46. The government may limit speech in a nonpublic forum to reserve the forum for the specific official uses to which it is lawfully dedicated. *See Rosenberger*, 515 U.S. at 829; *Capitol Square*, 515 U.S. at 761. When the government allows selective access to some speakers or some types of speech in a nonpublic forum, but does not open the property sufficiently to become a designated public forum, it creates a "limited public forum." *See Rosenberger*, 515 U.S. at 829-30; *Lamb's Chapel*, 508 U.S. at 390-92. For example, in *United States v. Kokinda*, 497 U.S. 720 (1990), a plurality of the Court concluded that the sidewalk in front of a post office was a nonpublic forum and upheld postal regulations banning solicitation on the sidewalk. *Id.* at 732-33. The Court recognized, however, that the postal sidewalk was "not a purely non-public forum" because it had been dedicated to some expressive activity--namely, the post office had permitted some speakers to leaflet and picket on postal premises. *Id.* at 730. Even so, since the postal sidewalk did not rise to the level of a designated public forum, the Court proceeded to analyze the regulations banning solicitation "under the standards set forth for nonpublic fora." *Id.*

Regulations of speech in a nonpublic or limited public forum are subject to the more deferential reasonableness standard. This does not mean the government

has unbridled control over speech, however, for it is axiomatic that "'the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.'" *Lamb's Chapel,* 508 U.S. at 394 (quoting *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984)). Thus, "[c]ontrol over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806.[15]

In other words, although content-based discrimination is permissible in a limited or nonpublic forum if it preserves the purpose of the forum, when the government moves beyond restricting the subject matter of speech and targets "particular views taken by speakers on a subject," such viewpoint discrimination

---

[15]In *Cornelius*, the Court elaborated on both the reasonableness and viewpoint neutrality prong of this test. With respect to reasonableness, the Court clarified that not only must the government's restriction be assessed in light of the purpose of the forum, but also "all the surrounding circumstances." *Cornelius,* 473 U.S. at 809. With respect to viewpoint neutrality, the Court stated:

> Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of a forum, or if he is not a member of the class of speakers for whose especial benefit the forum was created, the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.

*Id.* at 806 (citations omitted).

-21-

is "presumed impermissible." *Rosenberger,* 515 U.S. at 829-30. Viewpoint discrimination is thus a subset of and an "egregious form of content discrimination." *Id.* at 829. The Court in *Rosenberger* did not explain what specifically is needed to overcome this heavy presumption of impermissibility. However, we have interpreted *Rosenberger* to mean:

> [C]ourts must examine viewpoint-based restrictions with an especially critical review of the government's asserted justifications for those restrictions. At a minimum, to survive strict scrutiny the [government's] policy must be "narrowly drawn to effectuate a compelling state interest."

*Church on the Rock,* 84 F.3d at 1279-80 (quoting *Perry Educ. Ass'n*, 460 U.S. at 46).

In *Lamb's Chapel,* 508 U.S. 384, the Supreme Court directly addressed the problem of viewpoint discrimination raised by excluding private religious speech in a limited or nonpublic forum. A school district, pursuant to state statute, allowed various private organizations to use school property for social, civic, recreational, or political purposes. Lamb's Chapel, a church, petitioned the school district to show a film on child rearing and family issues from a religious perspective. The school district denied the church's request on the grounds that the film appeared "church related" and school property could not be used for religious purposes. *Id.* at 387-89. The trial and appellate courts held that the school property was a "limited public forum," and thus, exclusions needed only be

"reasonable and viewpoint neutral." *Id.* at 389-90. Both lower courts held that the school district's refusal to show the film met this standard. *Id.*

On appeal to the Supreme Court, Lamb's Chapel argued that the school property was a designated public forum, and therefore exclusions were subject to a heightened standard of review. The Supreme Court declined to reevaluate the public forum question, *id.* at 391-92, and instead took issue with the finding of viewpoint neutrality, *id*. at 392-93.

The Court rejected the appellate court's conclusion that the school district avoided viewpoint discrimination by treating all religions and all uses of school property for religious purposes alike--*i.e.*, by banning such uses entirely.[16] This analysis, in the Court's view, did not answer the "critical question" whether the school district engaged in viewpoint discrimination by allowing presentations about family issues and child rearing from nonreligious points of view while excluding a film dealing with the same subject from a religious perspective. *Id.* at 393. Because the church's film "dealt with a subject otherwise permissible" and it was "denied solely because [it] dealt with a subject from a religious standpoint," the Court held its exclusion amounted to viewpoint discrimination in violation of the church's free speech rights. *Id*. at 394.

---

[16]The Court likewise rejected the school district's argument that the denial was a "permissible subject-matter exclusion rather than a denial based on viewpoint." *Lamb's Chapel*, 508 U.S. at 396.

-23-

In *Rosenberger,* 515 U.S. 819, the Court clarified the distinction between content-based and viewpoint discrimination and adopted a broad construction of the latter, providing greater protection to private religious speech on public property. *See The Supreme Court--Leading Cases*, 109 HARV. L. REV. 111, 214 (1995); *see also Grossbaum v. Indianapolis-Marion Bldg. Auth.*, 63 F.3d 581, 590 (7th Cir. 1995). There, a state university permitted certain registered student groups to receive money from a student activities fund. The regulations governing access to the fund permitted student news groups to seek payment, but excluded religious activities from receiving any support. *Rosenberger*, 515 U.S. at 824-25. A Christian student newspaper requested money from the fund but was denied on the grounds that it was a religious activity. *Id.* at 826-27.

The university argued the regulation excluding all religious activities from receiving financial support was a permissible content-based restriction, which banned the entire subject matter of religion. *Id*. at 830. Although the Court recognized that "[r]eligion may be a vast area of inquiry," "it also provides . . . a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered." *Id.* at 831. The university permitted various other student news publications access to the fund, but denied money to one student news publication which discussed topics from a uniquely religious editorial viewpoint. The Court concluded that the university impermissibly excluded the

Christian newspaper based on its "prohibited perspective" of religion, and "not the general subject matter" of religion itself. *Id.*

In *Church on the Rock,* 84 F.3d 1273, we recognized the broad definition of viewpoint discrimination afforded by the Supreme Court to protect private religious speech on public property:

> Any prohibition of sectarian instruction where other instruction is permitted is inherently non-neutral with respect to viewpoint. Instruction becomes "sectarian" when it manifests a preference for a set of religious beliefs. Because there is no nonreligious sectarian instruction (and indeed the concept is a contradiction in terms), a restriction prohibiting sectarian instruction intrinsically favors secularism at the expense of religion.

*Id.* at 1279. *Church on the Rock* involved city-owned senior centers, which permitted private individuals and organizations to use the centers to provide classes and other activities for seniors, *id.* at 1276-77, including classes on the Bible from a literary, philosophical, and historical perspective, *id.* at 1279. City policy prohibited using the centers for sectarian instruction or as a place for religious worship, and thus, the city denied a church's request to show a film on Jesus, which advocated adopting Christianity. *Id.* at 1277. Relying on *Lamb's Chapel* and *Rosenberger*, we held that the city's prohibition against showing the church's film on Jesus, "[e]ven if the City had not previously opened the Senior

Centers to presentations on religious subjects," was viewpoint discrimination in violation of the First Amendment. *Id*. at 1279.[17]

In *Grossbaum*, 63 F.3d 581, a rabbi requested permission to erect a menorah in the lobby of a city building. The government denied the request because of a policy prohibiting the display of seasonal *religious* symbols in city buildings. The government erected a Christmas tree in the lobby, however, because it believed the *secular* nature of the Christmas tree would not result in a violation of its policy. *Id*. at 582-83. The Seventh Circuit concluded that the parties did not dispute the lobby was a nonpublic forum. *Id*. at 586. After an extensive analysis of *Lamb's Chapel* and *Rosenberger*, the court held that prohibiting a religious holiday display such as a menorah, while allowing a secular holiday display such as a Christmas tree to stand, constituted discrimination based on a religious viewpoint and violated the First Amendment. *Id*. at 591-92.

In sum, while the government does have wide discretion to regulate a nonpublic forum consistent with the specific purpose for which it was intended--

---

[17]In *Church on the Rock* we characterized the city-owned senior centers as designated public fora, but did not apply the compelling interest test applicable to such fora. Instead, we stated "the City's policy is properly analyzed as a viewpoint-based restriction on speech," and went on to hold that the city had violated the church's First Amendment rights on this basis. *Church on the Rock*, 84 F.3d at 1279.

including banning *all* speech displays--problems arise when the government allows *some* private speech on the property. If, for example, the government permits secular displays on a nonpublic forum, it cannot ban displays discussing otherwise permissible topics from a religious perspective. "The government is on the safest ground in denying a request to erect a display where it has consistently refused to allow any speech displays in the designated area." Andrew C. Spiropoulos, *The Constitutionality of Holiday Displays on Public Property (Or How the Court Stole Christmas)*, 68 OKLA. B.J. 1897, 1901 n.29 (1997).[18]

In dismissing Summum's free speech claims, the district court did not consider whether a limited or nonpublic forum had been created, nor did it apply or even discuss the reasonableness standard applicable to such a forum. The court apparently assumed that the only way Summum could prevail on its free speech claim was by establishing that a designated public forum had been created on the courthouse lawn. In light of recent cases discussed above, the district court erred in its assumption.

We conclude that Summum's amended complaint sufficiently alleges that a limited public forum has been created and that the County engaged in viewpoint

---

[18]*See also* Spiropoulos, *supra*, at 1903 ("If the requested forum is a nonpublic forum and no other speakers have been allowed to use that forum, then the city most likely can safely deny the request. If other speakers have been allowed to use the forum in a way similar to that requested by the religious speaker . . . , the religious group must receive the same permission.")

discrimination in violation of Summum's free speech rights. Summum alleges, and it is undisputed, that the County has permitted the Order of Eagles, a private fraternal organization, to place on government property a display espousing the Eagles' views. The installation of the monolith is enough to transform the property into a *limited* public forum as it has more recently been defined by the Supreme Court. The courthouse lawn cannot be characterized as a purely nonpublic forum reserved for specific official uses. By allowing access to the Eagles, the County has opened the forum to at least some private expression, clearly choosing not to restrict the forum to official government uses.[19]

---

[19]In finding that a public forum had not been created, the district court asserted that if Summum's position were adopted, "the County could no more chisel the words 'justice for all' into the facade above the courthouse entrance without opening itself to contrary opinions similarly displayed on the courthouse walls." Aplt. App. at 231. The district court's analogy, however, is inapt. The courthouse is a forum in which cases are tried and official judicial business is conducted; it is reserved for a specific use that is clearly incompatible with opening it up to the public for expressive activity. The inscription, which the County itself has chiseled on the courthouse, serves to add an air of solemnity or dignity to the judicial function. However, the County certainly need not allow any expression that is not relevant to conducting judicial business in or on the courthouse itself.

The Ten Commandments monolith here differs in many important respects from the district court's "justice for all" hypothetical. First, the monolith is private speech expressing the views of the Eagles and not speech the County itself has uttered in furtherance of official government business. Second, by allowing private speech on the courthouse lawn, the County has chosen not to reserve the forum for official government uses. Third, the monolith is situated on the courthouse lawn and not in the courthouse itself. Unlike the courthouse where the actual business of the judiciary is conducted, the courthouse lawn, being outside

(continued...)

Regardless of whether the courthouse lawn is described as a nonpublic or limited public forum, the distinction the County drew by excluding Summum's display while allowing the Eagles' display to stand must be reasonable in light of the purpose of the forum and be viewpoint neutral. Summum alleges that its requests to erect a similar monolith were summarily rejected, that County Commissioners have sole authority in deciding who may place a permanent monolith on county property as well as the content of such displays, and that the County seeks to censor Summum's ideas. As we discuss below, such "unbridled discretion" in the hands of government officials "raises the specter of . . . viewpoint censorship." *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 763 (1988). Construing the amended complaint in the light most favorable to plaintiff, we are persuaded Summum has sufficiently stated a claim for relief under the Free Speech Clause. We therefore reverse and remand for further proceedings.

On remand, the district court should carefully consider the allegations made in Summum's amended complaint that the County lacks rules or regulations

---

[19](...continued)
and somewhat comparable to a public park or a square in front of a state building, is not clearly incompatible with private expressive activity. The district court therefore need not be concerned that the courthouse itself has become a limited public forum simply because the County may have created a limited public forum by allowing a private display on the courthouse lawn.

governing the placement of permanent displays on county property in determining whether the County has acted reasonably and not arbitrarily. Allowing government officials to make decisions as to who may speak on county property, without any criteria or guidelines to circumscribe their power, strongly suggests the potential for unconstitutional conduct, namely favoring one viewpoint over another. As the Supreme Court explains:

> [A] law or policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship. This danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official . . . . [B]ecause without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker.

*City of Lakewood*, 486 U.S. at 763-64; *cf. American Jewish Congress v. City of Beverly Hills*, 90 F.3d 379, 385-86 (9th Cir. 1996) (en banc) (holding City's ad hoc, standardless policy for permitting private religious unattended displays in public park violates Establishment Clause because of its potential for impermissibly favoring one religion over another).

In *City of Lakewood*, 486 U.S. 750, the Court recognized that an absence of express standards made it far too easy for officials to use "post hoc rationalizations" and "shifting or illegitimate criteria" to justify their behavior, and thus make it difficult for courts to determine whether an official has engaged

-30-

in viewpoint discrimination. *Id.* at 758. Here, the County appears to have shifted positions on its reasons for denying Summum's application. In its letter to Summum, the County stated that the courthouse lawn was being reserved for other purposes, such as the construction of a county jail. Aplt. App. at 28. However, in its brief the County identified the purpose of the courthouse lawn as providing "an aesthetically pleasing entrance to the courthouse itself." Aplee. Br. at 22. If this is in fact true, it seems the difference in access to the courtyard between Summum and the Order of Eagles should have been based on the aesthetic value of the monuments, which the County has never argued. Indeed, at oral argument, the County suggested that Summum was denied access because its religious tenets lacked the historical significance and antiquity of the Ten Commandments. On remand, the district court must carefully scrutinize the validity of the County's stated reasons for refusing access to the courthouse lawn to ensure that the County's justifications are not simply "post hoc rationalizations" or a pretext for viewpoint discrimination. *See Cornelius*, 473 U.S. at 797, 811-13 (after finding public forum not created, remanding on issue of viewpoint discrimination and requiring further investigation of government's "facially neutral and valid justifications for exclusion" to determine whether stated reasons were "facade" for viewpoint discrimination).

## C. County's Establishment Clause Defense

The County argues that allowing Summum to erect its monolith on the courthouse lawn would amount to state endorsement of the Summum religion. In order to avoid an Establishment Clause violation, the County believes it was justified in denying Summum's requests. The Supreme Court has recognized the potential conflict between competing First Amendment values in cases involving private religious speech on government property, and has made clear that "the interest of the State in avoiding an Establishment Clause violation 'may be [a] compelling' one justifying an abridgment of free speech otherwise protected by the First Amendment." *Lamb's Chapel*, 508 U.S. at 394 (quoting *Widmar*, 454 U.S. at 271).

In the context of nonpublic or limited public fora, courts have consistently rejected the government's assertions that the Establishment Clause raises concerns outweighing plaintiffs' free speech rights. *See, e.g., Rosenberger*, 515 U.S. at 839-46; *Lamb's Chapel*, 508 U.S. at 394-95; *Grossbaum,* 63 F.3d at 594-95. The Supreme Court in *Rosenberger* made clear that the government's "neutrality towards religion" is a "significant factor" in determining that the Establishment Clause has not been violated. *Rosenberger*, 515 U.S. at 839; *see also Grossbaum*, 63 F.3d at 595 ("[W]hen evaluating the viability of an Establishment Clause defense, *Lamb's Chapel* suggests that an evenhanded,

neutral right of access is just as important in evaluating nonpublic or limited forums as it is in evaluating public forums."); *The Supreme Court--Leading Cases*, *supra*, at 217 (noting that *Rosenberger* ignored *Lemon* test and "instead applied a more coherent neutrality analysis"). As we explained, in order to avoid an Establishment Clause violation, "[t]he government need only remain neutral, preferring neither religious nor secular expression over the other." *Church on the Rock*, 84 F.3d at 1280 (citing *Rosenberger*, 515 U.S. at 839-40). Government neutrality is further apparent when "'the government has not willfully fostered or encouraged' any mistaken impression" that the private religious speech at issue speaks for the state, *Rosenberger*, 515 U.S. at 841 (quoting *Capitol Square*, 515 U.S. at 766), and "has taken pains to disassociate itself from the private speech," *id*.

Moreover, "the guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse." *Id.* at 839. Even if religion is benefitted incidentally, so long as the government treats religious and nonreligious speech evenhandedly and cannot be deemed to be sponsoring the religious activity, the government cannot plausibly argue that it is justified in denying private religious speech on public property because it fears the Establishment Clause will be offended. *Capitol Square*, 515

U.S. at 762-63; *Rosenberger*, 515 U.S. at 839-40.   Indeed, if the government denies access to private speech because of the religious viewpoint of the speaker, the denial itself "risk[s] fostering a pervasive bias or hostility to religion, which could undermine the very neutrality the Establishment Clause requires." *Id.* at 845-46.

The question here would be whether, by allowing Summum's monolith on the courthouse lawn, the County would "remain neutral, preferring neither religious nor secular expression over the other." *Church on the Rock*, 84 F.3d at 1280.  Since we previously ruled in *Anderson* that the Ten Commandments monument is primarily secular expression, allowing Summum's religious monolith on the courthouse lawn would arguably "respect" the Establishment Clause's command of government neutrality by "extend[ing] benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse." *Rosenberger*, 515 U.S. at 839.  The County could also easily require a disclaimer to distance itself from Summum's private religious speech. *See Capitol Square*, 515 U.S. at 769.  Moreover, if it is determined that the County discriminated against Summum based on Summum's religious viewpoint, it is highly unlikely the County could defend its actions on Establishment Clause grounds. *See Rosenberger*, 515 U.S. at 845 ("To obey the Establishment Clause,

it was not necessary for the University to deny eligibility to student publications because of their viewpoint.").

### III.

In summary, we disagree with the district court's conclusion that Summum's free speech claims are foreclosed as a matter of law. The district court failed to apply the standard applicable to a limited or nonpublic forum. Since we cannot conclude that Summum can prove no set of facts in support of its free speech claims that would entitle it to relief, we **REVERSE** the district court's grant of the County's motion to dismiss and we **REMAND** for further proceedings consistent with this opinion.[20]

---

[20]We also remand Summum's due process and state law claims. These claims were dismissed because the district court first dismissed all Summum's federal, substantive constitutional claims, and thus, the court never reached their merits.